James E. Cecchi, Esq.
jcecchi@carellabyrne.com
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
New Jersey, NJ 07068
Telephone: (973) 994-1700
Facsimile:  (973) 994-1744

*Attorney for Plaintiffs and the Putative Class*

[*Additional counsel listed on signature page*]

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| RYAN CHARLES CLARK and KRISTEN LUIZ, | Case No. _____ |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| BMW OF NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AG, | JURY TRIAL DEMANDED (VOLUME I) |
| Defendants. | |

## I.    INTRODUCTION

1.    Approximately two months ago, on April 27, 2023, the National Highway Traffic Administration ("NHTSA") informed ARC Automotive, Inc. ("ARC") that NHTSA had "tentatively concluded that ***a defect related to motor***

***vehicle safety exists*** in the frontal driver and passenger air bag inflators under investigation that were produced before installation of borescopes on all toroidal inflator manufacturing lines in January 2018 (emphasis added).[1] NHTSA demanded that ARC recall the defective inflators ("Defective Inflators") and "issue a Part 573 Recall Report addressing the safety defect."[2] NHTSA noted that ARC's 67 million Defective Inflators are contained in the driver and passenger frontal airbag modules of vehicles manufactured by at least 12 major vehicle manufacturers.[3] Most of these vehicles likely are on the road today, and tens of millions of people are at risk of serious injury or death. The vehicles affected by the inflator defect ("Inflator Defect") are the Class Vehicles in this case, and the owners and lessees of those vehicles are Plaintiffs and Class Members.

2.    NHTSA described the defect as the presence of loose weld "slag" or "flash" in the interior of the Defective Inflators.[4] This loose piece of metal flash can

---

[1] Letter from S. Ridella, Director, Office of Defects Investigation, NHTSA, to S. Gold, Vice President – Product Integrity, ARC (Apr. 27, 2023), attached as Exhibit A.

[2] *Id*.

[3] *Id*. at 1-2.

[4] *Id*. at 2. Within the industry the material at the seam of two parts joined by friction welding is commonly referred to as "flash," which is the term Plaintiffs use herein instead of "slag." *See* "Whiteboard Wednesday: Friction Welding Flash," Manufacturing Technology, Inc., available at https://blog.mtiwelding.com/whiteboard-wednesday-friction-welding-flash.

become dislodged during a crash and block the Defective Inflators' single ventilation port. As NHTSA found, "ARC's inflator design is such that during a triggered deployment, the stored gas, excited by the propellant, has a single path through the exit orifice to exit the inflator and fill the air bag cushion."[5] If a piece of loose weld flash blocks the ventilation exit port during deployment, the large volume of gas trying to travel from the inflator to the air bag cushion over-pressurizes the metal inflator, which causes a rupture that can result in "metal [inflator] fragments being forcefully propelled into the passenger compartment."[6]

3.      NHTSA concluded that the Defective Inflators "pose an unreasonable risk of death or injury," and that "[a]n airbag inflator that ruptures when deploying in a vehicle is plainly defective."[7] Confirming the obvious, NHTSA determined that "[a]irbag inflators that project metal fragments into vehicle occupants, rather than properly inflating the attached air bag, create an unreasonable risk of death and injury."[8]

4.      ARC rejected NHTSA's demand.[9] Instead of recalling the Defective

---

[5] *Id.* at 2. *Id*. at 2.

[6] *Id*.

[7] *Id*. at 4-5.

[8] *Id*. at 5.

[9] Letter from S. Gold, Vice President – Product Integrity, ARC, to S. Ridella, Director, Office of Defects Investigation, NHTSA (May 11, 2023), attached as Exhibit B.

Inflators, ARC "strongly" disagreed with NHTSA. ARC attacked NHTSA's authority, mischaracterized the statements in NHTSA's detailed six-page letter as "not based on any objective technical or engineering conclusion," despite acknowledging that NHTSA had been investigating the issue for years, and called the defect in its inflators "hypothetical" even though it had caused numerous documented ruptures, injuries, and fatalities.[10]

5.     This indifference to the safety of millions of motorists stands in stark contrast to ARC's portrayal of itself as a responsible company focused on safety, as expected of a manufacturer of airbag inflators. On its official website, ARC promises that "safety" and "integrity" are its core values. In its May 11, 2023 response letter to NHTSA, ARC repeatedly made similar claims; for example, "The safety of the motoring public is a cornerstone of our business." This is demonstrably untrue. Not only did ARC defy NHTSA and refuse to recall its Defective Inflators, but it failed to even notify consumers of the dangers they face or take any other action to protect the driving public.

6.     NHTSA's conclusions followed a nearly eight-year investigation. During that time, there have been at least 10 known ruptures of the Defective Inflators in vehicles, including seven driver inflators and three passenger inflators.

---

[10] *Id.* at 1.

Two of those ruptures resulted in driver fatalities. Additionally, numerous Defective Inflators ruptured during ARC's internal testing. These ruptures led to recalls of a fraction of the Class Vehicles with the defect. Those recalls are inadequate in scope because tens of millions of vehicles with the Defective Inflators still have not been recalled. Between 2017 and 2022, for example, BMW, Ford, GM, and Volkswagen (defined *infra*) collectively recalled fewer than 6,400 vehicles equipped with airbags containing Defective Inflators.

7.     On or about May 10, 2023, after NHTSA issued its April 27, 2023, letter, GM initiated a broader, yet still inadequate, recall of 994,000 of GM's "2014-2017 model year Buick Enclave, Chevrolet Traverse, and GMC Acadia vehicles." Contrary to NHTSA's findings that there is a design defect, GM said it was recalling these vehicles because of "a supplier manufacturing defect [that] may result in rupture during deployment." Nonetheless, GM agreed that "[a]n inflator rupture may cause metal fragments to pass through the airbag and into the vehicle interior, which may result in injury or death to vehicle occupants."[11]

8.     On information and belief, ARC worked with others to conceal the

---

[11] General Motors, LLC Part 573 Safety Recall Report, submitted May 10, 2023, NHTSA Recall No. 23V-334, Manufacturer Recall No. N232404980, available at https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V334-3594.PDF (last accessed June 13, 2023).

Defective Inflators for years. It had help from the "Airbag Module Suppliers" (defined *infra*) and the "Defendants" (defined *infra*). The Airbag Module Suppliers and Defendants have long known that ARC inflators are defective. The Defendants designate the specifications for the airbag inflators in their vehicles, which forbid structural failure and state that the inflators "shall not fail."

9.    Both the Airbag Module Suppliers and the Defendants develop design specifications for the ARC inflators and require that ARC conduct testing and evaluations as part of the Production Part Approval Process ("PPAP"), which is the process that documents ARC's conformance to Defendants' specifications. The Airbag Module Suppliers and Defendants also require testing of the ARC inflators and, if the inflator does not meet the specifications, the Airbag Module Suppliers and Defendants must grant an exception before the product is installed and sold. If there is an inflator failure, whether during testing or in the field, the Airbag Module Suppliers and Defendants review all the previous design, process, and testing documents to determine the root cause of the failure.

10.    Inflators and airbag modules are manufactured in groups that are known as "lots." Prior to installing a lot of inflators or airbag modules, the Defendants require that ARC perform Lot Acceptance Testing ("LAT") on both inflators and airbag modules and that they be notified of any inflator ruptures. The Defendants

also run their own tests on the airbag modules.[12] The Airbag Module Suppliers and Defendants were made aware of multiple LAT failures where the inflator ruptured during testing, as confirmed in several of the recalls. The Airbag Module Suppliers and Defendants were also made aware of ARC inflator ruptures in the field. Even though they knew about the defect, the Defendants still chose to sell tens of millions of vehicles with Defective Inflators to Plaintiffs and the Class Members.

11.    Defendants have taken a lot-based recall approach to date. In a lot-based recall, Defendants identify the lot of a failed inflator and then issue a recall notice for this finite population of inflators. An Automaker Defendant "assumes" the defect was caused by a lot-specific manufacturing error rather than by a fleet-wide design defect and then waits until the next failure takes place before it issues further recalls.[13]

---

[12] *See, e.g.*, https://static.nhtsa.gov/odi/inv/2016/INRL-EA16003-87413P.pdf (Ford requires ARC to "conduct Lot Acceptance Testing, Conformance of Production, or other production part testing to ensure conformance to design and performance requirements and/or quality control standards prior to shipping the components.").

[13] Several Defendants in this case took a similar lot-based recall approach early in the *In re Takata Airbag Products Liability Litigation*, MDL No. 2599. Eventually all the Automakers defendants in that case were required to recall all vehicles with the defective inflators because NHTSA found it was a dangerous design defect that affected all vehicles with the inflators. Not coincidentally, the defective Takata inflators – like the ARC inflators here – sometimes exploded and spewed sharp metal fragments into the faces and necks of drivers and passengers when their air bags deployed in a crash.

12.    NHTSA's correspondence confirms that ARC was regularly in touch with the Automaker and Module Defendants throughout NHTSA's investigation of the Defective Inflators. Defendants continued to profit from the sale, service, and use of the Defective Inflators, while the Class bore the safety risk and related economic loss.

13.    On May 31, 2023, NHTSA issued a Special Order to ARC (1) outlining its investigative efforts and ARC's refusal to issue a recall, (2) requiring ARC to file answers to questions under oath, and (3) requiring ARC to produce certain documents by June 14, 2023.[14] NHTSA's Special Order seeks information that ARC has yet to provide NHTSA or its customers, including whether ARC contends that its airbag inflators are expected to occasionally experience a field rupture, the estimated number and frequency of field ruptures ARC expects to occur, and whether ARC has notified its customers that its inflators are expected to occasionally experience field ruptures.

14.    On June 14, 2023, ARC responded to NHTSA's Special Order under oath [15] Among other things, ARC admitted that it "designs its inflators,

---

[14] Special Order Directed to ARC, *In re: EA 16-003 Air Bag Inflator Rupture* (NHTSA May 31, 2023), attached as Exhibit C.
[15] ARC's Written Response to May 31, 2023 Special Order, *In re: EA 16-003 Air Bag Inflator Rupture* (NHTSA June 14, 2023), attached as Exhibit D.

manufacturing processes, and quality controls to operate within the manufacturing and performance parameters specified by its customers," *i.e.*, the Automaker and Airbag Module Suppliers. ARC admitted that it did not have any expectation that the inflators at issue "would occasionally experience a field rupture."

15. ARC also admitted that it has not taken any measures to notify its customers or consumers of the danger related to their inflators outside of the processes already embodied by the Advance Product Quality Process ("APQP"). ARC also confirmed that its customers participate in the design of the inflators and validation of the inflators in a process known as the Design Failure Mode and Effects Analysis ("DFMEA"). ARC confirmed that these customers required ARC to meet their own "specifications and quality requirements." The DFMEA includes a Process Failure Mode and Effects Analysis ("PFMEA"), "which evaluates each process step" and ultimately subscribes a Risk Priority Number ("RPN") to the relevant failure modes. ARC's customers have the right to review or audit each of these processes and make their own determination of whether the inflators are satisfactory.

16. ARC also confirmed that for ruptures that occur during testing, ARC notified the Airbag Module Suppliers and vice versa. ARC further confirmed that it was not able to estimate the number of field ruptures it expects to occur at this time.

17. NHTSA specifically asked ARC to state the number of inflators that it

had rejected due to "weld flash." ARC confirmed that, as late as 2016, it was not checking for weld flash issues with a borescope and, therefore, it does not know how many inflators were rejected for this reason. ARC did provide the numbers to NHTSA for weld flash rejections from August 2017 to May 31, 2023, but that information was stored on a drive and submitted as confidential. Therefore, the Class does not yet have that information.

18.    These answers confirm that the defect in ARC inflators is one of design, not a one-off manufacturing defect and, just as ARC, that Class Members would not reasonably expect the defect to occur. They also confirm that the Automaker and Airbag Module Suppliers were aware of the relevant rupture rate involved in the design process with ARC, such that they have responsibility for the defects alleged herein.

19.    Plaintiffs seek to accomplish what ARC refuses to do, even when confronted by NHTSA. Plaintiffs seek to remove the dangerous Defective Inflators off the road and install airbags with demonstrably safe inflators in the Class Vehicles, enjoin Defendants from further jeopardizing the lives of tens of millions of Class Members, and compensate Plaintiffs and Class Members for the economic damage they have incurred from buying cars with defective safety systems.

20.    The Class is a nationwide class that includes "all consumers in the

United States who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC between 2001 and 2018."[16] The Class does not include: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class Counsel; and (e) any person who timely and properly excludes himself or herself from the Class.

21.    The State Subclasses consist of "all consumers in their state of residence who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC between 2001 and 2018." The State Subclasses do not include: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class Counsel; and (e) any person who timely and properly

---

[16] At this early stage and without the benefit of discovery, Plaintiffs cannot determine with certainty each vehicle by make, model, and model year equipped with the Defective Inflators but have included those about which they are reasonably confident. Plaintiffs may amend their pleadings to add vehicles if they are identified in the discovery process.

excludes himself or herself from the Class.

22.    Consistent with Federal Rule of Civil Procedure 23(c)(5), which sanctions the creation of subclasses "[w]hen appropriate," Plaintiffs reserve their right to modify the Class and the State Subclasses as discovery progresses and at the class certification stage.

23.    As NHTSA explained, instead of protecting Class Members during a crash, the Defective Inflators may explode, sending shrapnel into the passenger compartment and injuring or killing occupants. Class Members were not aware of the defect when they purchased or leased their Class Vehicles. Therefore, they overpaid for their Class Vehicles. The Defective Inflators also significantly diminished, and will continue to diminish, the value of the Class Vehicles. Worse yet, Class Members now face Hobson's choice: continue to drive their Class Vehicles and face the risk of catastrophic injury or replace the airbag modules containing Defective Inflators out of their own pockets.

24.    Plaintiffs, on behalf of themselves and all others similarly situated, assert nationwide and state claims and seek all available damages, penalties, and punitive damages for Defendants' egregious conduct. Plaintiffs also seek declaratory and injunctive relief, including a Court order directing Defendants to expeditiously repair the Class Vehicles with demonstrably safe airbags.

## II.    PARTIES, JURISDICTION, AND VENUE

### A.    The Defendants

25.    At all relevant times, as alleged below, each Defendant herein was authorized to (and did) conduct business within each state and territory of the United States and supplied its products to Class Members in said states and territories. Each Defendant received financial benefit and profits as a result of designing, manufacturing, testing, marketing, distributing, importing, and selling Defective Inflators (or Class Vehicles with installed Defective Inflators), either directly or through a subsidiary or agent, within each state and territory of the United States. Additionally, no Plaintiff relinquishes the right to amend his or her individual claims to include additional claims as discovery proceeds and facts and other circumstances may warrant, pursuant to the appropriate Federal Rules of Civil Procedure or a subsequent order.

26.    Defendant BMW of North America, LLC ("BMW America") was formed under the laws of Delaware and maintains its principal place of business in New Jersey. BMW America is a distributorship headquartered at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677. BMW America, a New Jersey limited liability company, is registered to do business in the state of South Carolina. BMW America imports, promotes, advertises, distributes, and sells BMW AG and/or BMW

brand cars, trucks, and sport utility vehicles in the United States.

27.     Defendant Bayerische Motoren Werke ("BMW AG") is incorporated under the laws of Germany and maintains its principal place of business in Germany.

28.     BMW AG and BMW America are collectively referred to as the "BMW Defendants" or as the "Defendants."

29.     At all times alleged herein, the BMW Defendants were authorized to conduct and did engage in substantial business within each state and territory of the United States and supplied products within them, including the states of South Carolina and New Jersey, such that they should anticipate being haled into Court there. The BMW Defendants maintain contractual relationships with the ARC Defendants and/or the Airbag Module Suppliers to purchase component parts with the intent they be installed and sold in Class Vehicles, including vehicles in South Carolina and New Jersey, sold through a network of dealerships within those states. Moreover, these contractual relationships are centered in South Carolina, as BMW Mfg. is headquartered there. Its distributorship is headquartered in New Jersey. Thus, the BMW Defendants have afforded themselves the protection of New Jersey and South Carolina laws. The BMW Defendants also committed the tortious acts alleged in this Complaint in whole or in part in the States of New Jersey and South Carolina by virtue of marketing and selling its vehicles intrastate to New Jersey and South

Carolina consumers.

30.    The BMW Defendants deliver their products into the stream of commerce with the expectation that they will be purchased by consumers in all of the United States, purposefully avail themselves of the laws of each state and territory of the United States, and receive financial benefit and profits as a result of designing, manufacturing, testing, marketing, distributing, storing, and/or selling the Class Vehicles, either directly or through subsidiaries, within each state and territory of the United States. As such, the claims in this case arise out of or relate to BMW Defendants' contacts with New Jersey.

31.    Therefore, general and specific jurisdiction is proper under the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America, the New Jersey Long Arm Statute, and N.J. Ct. R. 4:4-4(6).

**B.    The Plaintiffs**

32.    Plaintiff Ryan Clark resides in Mount Pleasant, South Carolina. Plaintiff owns a 2015 BMW X5, which he purchased used in South Carolina in approximately November 2019. Plaintiff's vehicle was covered by a written warranty.  Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to BMW's advertisements, promotional materials and

other public statements, Plaintiff was aware of BMW's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on BMW's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did BMW disclose that it was not safe or dependable, or that it was equipped with an airbag containing a defective ARC inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained airbags with defective ARC inflators and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbags with the defective ARC inflators in his Class Vehicle have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from BMW in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

33.    Plaintiff Kristen Luiz resides in Rutland, Massachusetts. Plaintiff owns a 2015 BMW X5, which she purchased used on or about August 29, 2017 for approximately $39,517.06 from Wagner BMW of Shrewsbury in Shrewsbury, Massachusetts, an authorized BMW dealership. Plaintiff's BMW X5 was covered by a written warranty.  Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to BMW's advertisements, promotional materials and other public statements, Plaintiff was aware of BMW's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on BMW's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable.  At no point before Plaintiff purchased her Class Vehicle did BMW disclose that it was not safe or dependable, or that it was equipped with an airbag containing a defective ARC inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained airbags with defective ARC inflators and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the

airbags with the defective ARC inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would have paid less to do so. Plaintiff Kristen Luiz would purchase a vehicle from BMW in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

### C. Relevant Nonparties

#### 1. ARC

34.    ARC is a Delaware corporation, headquartered at 1729 Midpark Road, Suite 100, Knoxville, Tennessee 37921. It has manufacturing facilities in Morgantown, Kentucky, and Hartsville, Tennessee, among others around the United States and the world. ARC manufactures a full complement of airbag inflators and related parts. ARC's factory in Knoxville, Tennessee, is one of the three American factories maintained by ARC. This factory assembles and tests ARC products for distribution around the country and Tennessee, including some of the Defective Inflators at issue in this case.

#### 2. The "Airbag Module Suppliers"

##### a. AUTOLIV

35.    AUTOLIV, INC. is incorporated in Delaware and maintains its

principal place of business in Sweden. AUTOLIV, INC., created, operates, and substantially controls AUTOLIV ASP, INC., which develops, designs, tests, markets, promotes, and distributes Autoliv-brand automotive component parts and passive safety systems, including the airbag modules at issue in this lawsuit, throughout the United States, including Tennessee. Although AUTOLIV, INC., is headquartered in Sweden, it is a publicly traded company listed on the New York Stock Exchange and publicly represents that its "corporate governance is subject primarily U.S. federal and state regulations . . ." This is the Company's "primary listing," meaning that it has chosen to subject itself to the corporate governance laws of the United States.

36.    AUTOLIV ASP, INC., was formed under the laws of Indiana and maintains its principal places of business in Ogden, Utah, and Auburn Hills, Michigan. AUTOLIV ASP, INC., operates five manufacturing facilities in Utah. The Utah and Michigan facilities both design, manufacture, test, market, and sell airbag modules and components, including inflators and propellant. AUTOLIV ASP, INC., also operates two Autoliv Technical Centers in the United States that help develop, design, and test airbag modules and their components for various vehicle platforms. AUTOLIV, INC., and AUTOLIV ASP, INC., are collectively referred to as the "AUTOLIV."

37.    In 2009, AUTOLIV acquired Delphi Automotive which, according to

NHTSA, manufactured approximately 11 million Defective Inflators under a licensing agreement with ARC for earlier model year Class Vehicles. On information and belief, AUTOLIV are successors-in-interest to the liabilities of Delphi Automotive in this case. AUTOLIV ASP, INC., may be served by and through its registered agent for service of process, CT Corporation System, 1201 Peachtree Street, NE, Atlanta, Georgia 30361. AUTOLIV, INC., may be served by and through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

### b.    Joyson

38.    Joyson Safety Systems ("Joyson") is incorporated under the laws of Delaware and maintains its principal place of business in Michigan and has offices in Sunnyvale, California. Joyson develops, designs, tests, markets, promotes, and manufactures airbag modules and inflators for, and distributes and sells them to, the Defendants, including the airbag modules at issue in this lawsuit, throughout the United States, including Michigan and California. Joyson and its predecessor companies, including Key Safety Systems, Inc., have repeatedly used the Port of Savannah, Georgia, to transport and facilitate the distribution of its component parts including airbag inflators and airbag inflator modules.

### c.    Toyoda Gosei

39.    Toyoda Gosei North America, Inc., ("Toyoda Gosei") is incorporated under the laws of Michigan and has its principal place of business in Michigan. Toyoda Gosei incorporates ARC inflators into airbag modules for use in vehicles manufactured by one or more of the Defendants.

### d.    ZF

40.    ZF are ZF Active Safety and Electronics US LLC; ZF Passive Safety Systems US Inc.; ZF Automotive US Inc.; ZF TRW Automotive Holdings Corp.; and ZF Friedrichshafen AG. Plaintiffs refer to these Defendants collectively as the "ZF." Plaintiffs refer to ZF Active Safety and Electronics US LLC, ZF Passive Safety Systems US Inc., ZF Automotive US Inc., ZF TRW Automotive Holdings Corp. as the "Domestic ZF."

41.    ZF Active Safety and Electronics US LLC (referred to herein as "ZF Electronics USA") is a Delaware LLC headquartered in Michigan. It formerly operated under the name "TRW Automotive U.S. LLC." ZF Electronics USA designed, manufactured, and sold some airbag modules that incorporated ARC's Defective Inflators.

42.    ZF Passive Safety Systems US Inc. (referred to herein as "ZF Passive Safety USA") is a Delaware corporation headquartered in Michigan. It previously

operated under the name "TRW Vehicle Safety Systems, Inc." ZF Passive Safety USA worked closely with ZF Electronics USA to design the airbag modules that incorporate ARC's Defective Inflators. During the relevant period, it issued paychecks to the vast majority of ZF engineers and technical specialists who were responsible for the core design of the relevant airbag modules, the adaptation of those modules to the various makes and models of the Class Vehicles, and the investigation of Defective Inflators.

43.    ZF Automotive US Inc. (referred to herein as "ZF Automotive USA") is a Delaware corporation headquartered in Michigan and the direct parent and 100% owner of ZF Passive Safety USA and ZF Active Safety and Electronics US LLC. It formerly operated under the name "TRW Automotive Inc." It shares responsibility with ZF Electronics USA for the design and manufacture of the airbag modules at issue in this case.

44.    ZF TRW Automotive Holdings Corp. (referred to herein as "ZF TRW Corp.") is a Delaware Corporation headquartered in Michigan and the direct parent and 100% owner of ZF Automotive USA. ZF TRW Corp. is also the entity that contracted with several Defendants on behalf of itself and all its subsidiaries.[17] ZF

---

[17] Some of these contracts predated the existence of ZF TRW Corp. and were signed by TRW Inc., its corporate predecessor. In 2004, ZF TRW Corp. assumed

Passive Safety USA, ZF Electronics USA, and ZF Automotive USA designed, made, and sold the relevant airbag modules pursuant to these ZF TRW Corp. contracts.

45.    Although ZF Passive Safety USA, ZF Electronics USA, ZF Automotive USA, and ZF TRW Corp. claim they are independent companies, the facts suggest otherwise. In their dealings with NHTSA in other cases and their judicial submissions, individuals who received paychecks from ZF Passive Safety USA alone have also held themselves out as representatives of ZF Electronics USA and ZF TRW Corp. For example, in 2016, Marc Bolitho received his paychecks from ZF Passive Safety USA but described himself to NHTSA as the Director of Passive Safety Engineering for ZF TRW Corp. and Vice President of Passive Safety Engineering for ZF Electronics USA. Similarly, Emanuel Goodman, a Technical Specialist, received paychecks from ZF Passive Safety USA between 2012 and 2019, but has identified himself as an employee of ZF Electronics USA and ZF Automotive USA in testimony in judicial proceedings. Moreover, ZF TRW Corp. (and its predecessor, TRW Inc.) regularly bound ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA to written contracts using signatures from ZF TRW Corp. (or TRW Inc.) executives and without any separate signature from ZF Passive

_____

substantially all of TRW Inc.'s contractual obligations and other liabilities relating to TRW Inc.'s automotive business, when ZF TRW Corp. spun out from a privately owned company.

Safety USA, ZF Electronics USA, and ZF Automotive USA. Accordingly, these companies share personnel and frequently operate jointly as one unit, and their knowledge and actions are imputed to each other.

46.   ZF Friedrichshafen AG is a German corporation headquartered in Germany and the parent owner of the Domestic ZF.

47.   The origins of the relevant business line of ZF traces back to an automotive supplier from the early 1900s named the Cleveland Cap Screw Company.

48.   During the relevant time period prior to May 15, 2015, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA operated as subsidiaries of the ultimate parent company ZF TRW Corp. (then called TRW Automotive Holdings Corp.), which was a publicly traded company listed on the New York Stock Exchange.

49.   ZF Germany reviews and approves the statements its domestic subsidiaries make to NHTSA regarding airbag module design and failure. Furthermore, on information and belief, ZF Germany reviews and approves reports of any airbag failures related to ARC's Defective Inflators before transmission to any Automaker Defendant.

50.   ZF Germany is a parent company that exerts substantial control over its

U.S. subsidiaries headquartered in Michigan (ZF Electronics USA; ZF Passive Safety USA; ZF Automotive USA; and ZF TRW Corp.), collectively referred to herein as the "Domestic ZF." These domestic subsidiaries have forum-related contacts in the United States that give rise to the claims in this action, and those contacts are properly imputed onto ZF Germany for the purposes of establishing personal jurisdiction.

51.    On information and belief, ZF Germany has authority over the Domestic ZF because it directly or indirectly owns and controls the voting power over the Domestic ZF.

52.    On or around May 15, 2015, ZF Germany and its subsidiaries acquired ZF TRW Corp. (then known as TRW Automotive Holdings Corp.) and its subsidiaries. The purchase price was approximately $12 billion. ZF TRW Corp. was (and remains) an American corporation, headquartered in Michigan. The merger was the largest acquisition in ZF Germany's 100-year history. At the time, ZF Germany reported that "TRW Automotive Holdings Corp. . . . is almost as big as ZF." On information and belief, ZF Germany's primary reasons for acquiring ZF TRW Corp. included its ties to the United States, its history and standing in the United States automotive industry, and the know-how of its United States personnel. ZF Germany's sales in North America make up a significant portion of the company's

business. According to ZF Germany's 2021 annual report, North America accounted for 27% of the company's sales.

53.    On information and belief, since the merger, ZF Germany has had the power to appoint board members to all the Domestic ZF. It has exercised this power to appoint board members to these subsidiaries that it believes will manage the subsidiaries with the principal goal of benefiting ZF Germany. For example, after ZF Germany acquired ZF TRW Corp. and its subsidiaries, Dr. Franz Kleiner, a member of ZF Germany's Board of Management, took over responsibility for the acquired company. After Dr. Kleiner retired, ZF Germany appointed Dr. Martin Fischer as his replacement on ZF Board of Management, who took over Dr. Kleiner's responsibilities, including active and passive safety systems and the North America Region.

54.    Following the May 15, 2015 acquisition of ZF TRW Corp., ZF Germany exercised significant control over the day-to-day operations of the Domestic ZF in the United States. ZF Germany's control over the day-to-day operations of the domestic subsidiaries is evident from the fact that, Dr. Fischer—the member of ZF Germany's Board of Management who is also the president of ZF North America, Inc.—is permanently based in Michigan.

55.    ZF Germany's 2015 Annual Report describes its efforts to integrate

TRW:

> To ensure the top quality of our products and services at economic costs, ZF is generating new synergies through the integration of ZF TRW: Knowledge sharing and the further development of common standards will improve the quality of our products even further. Materials procurement of the two companies is also being merged – with positive repercussions for the cost structure. . . .

> A common objective of the Supervisory Board and the Board of Management to ensure long-term success is the sustainable further development of ZF Group based on the requirements for new technologies in an increasingly dynamic market. The pooling of the Group's e-mobility activities in the new E-Mobility Division, ZF's acquisition of Bosch Rexroth's industrial drives segment and, above all, the successful integration of ZF TRW play a major role here. The Supervisory Board will closely follow the further development of these activities. The know-how of ZF TRW, incorporated into the new Active & Passive Safety Technology Division, opens up new opportunities for ZF to actively shape both the safety and automated driving megatrends. The process and structure of ZF TRW's integration as well as the adapted ZF management concept were regularly deliberated by the Board . . . .

> The members of the Board of Management are assigned directly to the six divisions as well as to ZF Services Business Unit. The same applies to the responsibilities with regard to the Regions of North America, South America and Asia-Pacific. The Group structure with six divisions is aligned with the market and customers. . . .

> The Active & Passive Safety Technology Division has been managing the business activities of the acquired company TRW Automotive Holdings Corp. since May 15, 2015. It includes the following business units: Braking Systems, Steering Systems, Commercial Steering Systems, Occupant Safety Systems, Electronics, Body Control Systems, Engineered Fasteners & Components and Parts & Service.

56.    ZF Germany integrated its physical locations with ZF TRW Corp. and

its subsidiaries. For example, in the year after ZF Germany acquired ZF TRW Corp., ZF Germany's CEO Stefan Sommer stated in an interview that the company was re-aligning its North American activities and bringing the businesses together "under one roof" in the former TRW headquarters in Livonia, Michigan. ZF Germany already had a significant presence in the United States before acquiring TRW Automotive Holdings Corp. and its subsidiaries. As of 2013, ZF Germany and its subsidiaries had about 3,700 employees in the United States, including roughly 1,000 employees at three facilities in Michigan.

57.    ZF Germany has a common pattern and practice of describing itself, ZF TRW Corp., and ZF TRW Corp.'s subsidiaries as a single, unified entity. After the 2015 acquisition, for example, TRW Automotive's business activities were described as continuing as a "division" of ZF—ZF Active and Passive Safety Technology division. In 2017, Dr. Kleiner reiterated the unified nature of the companies while explaining that the TRW named would be retired because integration was complete: "Now we believe the public, and employees, understand and identify with this organization as a combined company under ZF." A March 2018 letter from ZF Germany CEO Wolf-Henning Scheider similarly highlights the unified nature of ZF Germany, ZF TRW Corp., and ZF TRW Corp.'s subsidiaries: "An important operational highlight to mention is the integration of TRW into ZF

Group. The new ZF brand image unveiled for the first time at IAA 2017 makes the merging of the two companies also apparent to the public. ZF is now 'one company'."

58.    A March 2018 letter from Franz-Josef Paefgen, Chairman of ZF Germany supervisory board states:

> A key component of [ZF 2025 Strategy], namely the integration of TRW Automotive Holding Corp, acquired in May 2015, was essentially complete by the end of the fiscal year [2017] with merged corporate functions, a unified identity and the remaining activities transferred into the line organization. Since the beginning of 2017, the service activities of ZF and TRW have been successfully brought together into one organization, 'ZF Aftermarket'.

This statement further exemplifies ZF Germany's common pattern and practice of describing itself, ZF TRW Corp., and ZF TRW Corp.'s other U.S. affiliates as a single, unified entity.

59.    ZF Germany's 2017 Annual Report states:

> In order to ensure the company's long-term success, corporate social responsibility has to be assumed and business activities must be managed responsibly, sustainably and with integrity. With its effective Compliance Management System (CMS) that was further developed in 2017, ZF has taken this responsibility to heart. ZF and ZF TRW compliance areas were merged on July 1, 2017. In the course of the integration, the legal and compliance organizations of ZF Group were also merged. The Board Member for Human Resources and Governance is now responsible for them.

Based on this statement and on information and belief, ZF Germany controls and

develops the policies for the senior executives of the merged compliance, human resources, and governance functions of all the Domestic ZF.

60.    ZF Germany's companywide compliance guide dated July 2018 states:

> Product compliance is an important priority for ZF. ZF holds itself to the highest standards of legal and ethical conduct and is committed to making high quality products that are safe and comply with applicable laws, regulations, and standards. These principles are implemented through ZF's policies, processes and structures, and all ZF employees are held to these standards.

On information and belief, ZF Germany distributed the compliance guide to all the Domestic ZF and was responsible for enforcing (and failing to enforce) it.

**D.    Jurisdiction and Venue**

61.    Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Defendants' home states, there are more than 100 putative Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Also, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

62.    This Court has personal jurisdiction over each Defendant because, for the majority of the relevant time period, the tortious acts and omissions were directed from and occurred in the United States at the BMW America's headquarters in New Jersey. BMW America is the agent and/or alter ego of BMW AG.

63.    Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District where BMW America is and was headquartered.

## III.    FACTUAL ALLEGATIONS

### A.    ARC's History

64.    ARC has a long history of developing pyrotechnic propellants for use in rocket motors and airbag inflators, among other products. The company was formed in 1949 under the name Atlantic Research Corporation, with the aim of developing propellants for the U.S. Department of Defense.[18]

65.    ARC first supplied propellant for passenger-side airbag inflators in 1970 and developed its first hybrid passenger inflators as part of a joint venture with Allied Signal in 1993.[19] Today, ARC is a global manufacturer that produces a full complement of inflators for automotive airbag applications (driver, side, head, knee, seat, seatbelt, and curtain).

66.    ARC has factories all over the world, including in Knoxville, Morgantown, and Hartsville, Tennessee; Xi'an and Ningbo, China; and Skoplje, Macedonia.[20]

---

[18] About Us, ARC, http://www.arcautomotive.com/about.html (last accessed June 28, 2023).
[19] *Id.*
[20] ARC's plant in Reynosa, Mexico, is in the process of shutting down.

67.    Of the 67 million Defective Inflators at issue in this action, ARC designed and manufactured nearly all of them. Though ARC claims that Delphi (now owned by AUTOLIV, *see supra* ¶¶ 30-36) manufactured 11 million of the Defective Inflators, the inflators manufactured by Delphi were likely manufactured to ARC's specifications and include a label identifying both ARC and Delphi as the manufacturers.[21]

### B.    The Airbag Supply Chain

68.    In the automotive industry, ARC is known as a "Tier 2 supplier," meaning it supplied the Defective Inflators, and other automotive components, to the Airbag Module Suppliers. The Airbag Module Suppliers are known as "Tier 1 suppliers" and include AUTOLIV, Joyson, Toyoda Gosei, TRW, and Hyundai Mobis. The Airbag Module Suppliers supplied completed airbag modules to the Defendants, *i.e.*, major auto manufacturers and distributors, who incorporated the modules into the completed Class Vehicles, which they manufactured, distributed, marketed, and sold.

69.    ARC, the Airbag Module Suppliers, and the Defendants shared

---

[21]                                    *See*,                                    *e.g.*,
https://www.ebay.com/itm/125918786116?epid=1022168909&hash=item1d51583
244%3Ag%3AymQAAOSwFZ1kU5nz&fits=Year%3A2006%7CModel%3ASierr
a+1500%7CMake%3AGMC (last accessed June 12, 2023).

information and worked together throughout the design, manufacturing, assembly and investigation process using the APQP process, in which the suppliers and customers communicate during every step of design and testing.[22] For example, the Defendants supply the Airbag Module Suppliers with end product specifications of airbag modules that will fit into the Defendants' vehicles as well as the ballistic and timing requirements the airbag inflators must meet.[23] These specifications consist of regulatory requirements and contractual performance requirements negotiated by the Defendants among each other.

70.    After ARC develops the design for the inflator, it creates a DFMEA, which evaluates the potential failure modes that could occur with the inflator, such as overpressurization caused by various issues, and the possible effects that could result from those failures, such as rupture.[24] The DFMEA is used to identify the possible problems that could arise with the design and to evaluate whether certain aspect should be redesigned to address the most severe failure effects.[25] The DFMEA ranks each failure effect by the level of severity should it occur, with 10 being the

---

[22] *In re: EA16-003 Air Bag Inflator Rupture*, ARC's Written Response to May 31, 2023 Special Order, at 6.
[23] *Id.*
[24] *Id.*
[25] Potential Failure Model and Effects Analysis (FMEA), 4th ed. 2008, at PDF 24.

highest severity; the likelihood the failure will occur; and the ability of the design controls to detect the failure mode before it occurs.[26] These rankings are used to calculate a RPN that assesses the overall design risk. When the severity ranking is high and when the RPN is high, engineers must implement corrective actions to ensure the failure mode does not occur.[27] Once the DFMEA is completed, the supplier creates a PFMEA that uses the same criteria to evaluate each step in the process to identify issues that could arise during the manufacturing process and creates a Control Plan to minimize the chance of these manufacturing errors occurring.[28]

71.    The DFMEA, PFMEA, and Control Plan are all reviewed by the Tier 1 suppliers and the Automaker customers as part of the PPAP, which requires that the supplier provide documents showing that the inflator was designed, manufactured, and tested to meet the Tier 1 and Automaker requirements, prior to its approval for production. During this process, the Tier 1 and Automaker participants review the RPN and inform the Tier 2 supplier if they believe the RPN is too high and requires

---

[26] *Id.* at PDF 21.
[27] *Id.* at PDF 66-67.
[28] *In re: EA16-003 Air Bag Inflator Rupture*, ARC's Written Response to May 31, 2023 Special Order, at 6.

a redesign to lower the risk.[29] ARC's response to NHTSA's Special Order confirms that the PPAP process was followed for the Defective Inflators.[30] Thus, the Defective Inflators' design and manufacture, including the use of friction welding without a process for inspecting the center support for weld flash, would have been reviewed by the Airbag Module Suppliers and the Defendants and approved prior to their production, purchase, and installation.

72.    When a safety or performance issue arises with an automotive part, like the airbag module assembly, or one of its components, like the inflator, the Airbag Module Suppliers and Defendants have the right and obligation to examine design and validation testing for all relevant components. In fact, on information and belief, the Defendants have reserved this contractual right for themselves when dealing with Tier 1 and Tier 2 suppliers.

73.    In NHTSA's April 2023 letter to ARC and ARC's response, it is clear that all Defendants in this action have been aware of and worked on the defect issues from the outset. For example, ARC admits that while the Defendants are not ARC's direct "customers"; in this instance, some Defendants have "worked directly with ARC during the course of NHTSA's investigation" into the failure of the Defective

---

[29] *Id.*

[30] *Id.*

Inflators.

74.     Thus, at least by the time the ARC Defective Inflators began rupturing and NHTSA began investigating, the Defendants had examined, or should have examined, all design and manufacturing documentation related to ARC's inflators. The Defendants would have worked with both ARC and the Airbag Module Suppliers during these evaluations.

**C.     ARC's Airbag Inflators**

75.     Airbags are a critical safety feature in every car sold in the United States since 1999. They are required by law and prevent serious injury and death during accidents. To effectively shield passengers from impact with the vehicle interior, airbags must deploy quickly. Thus, airbag systems use a carefully and precisely controlled explosion to rapidly inflate the airbag cushion upon collision. The explosive charge is typically created by a chemical propellant. The airbag inflator is a metal canister that houses the chemical propellant and controls its release. In a collision, the propellant generates gases to inflate the airbag cushion.

76.     The diagram below illustrates the basic components of the driver airbag system:



77.     ARC's Defective Inflators are found in both driver and passenger side airbags and are known as hybrid inflators. According to ARC, this technology uses compressed gas "augmented by limited amounts of pyrotechnic material."[31] Hybrid inflators combine the use of a propellant and a quantity of stored pressurized inert gas to inflate the airbag cushion. In a crash, the inflator ignitor starts the chemical propellant reaction to produce a portion of the gas while stored pressurized gas, which expands due to the heat generated during the burning of the propellant, inflates the remainder of the cushion.

78.     ARC's Defective Inflators are all similarly "toroidal," or doughnut shaped, and structured for both driver and passenger side airbags. During the Class

---

[31]Products, ARC, http://www.arcautomotive.com/products.html (last accessed June 5, 2023).

Period, ARC designated its driver hybrid toroidal inflators as CADH/DH-7 (single stage) and DCADH (dual stage). ARC designated its passenger inflators as PH7-90, PH7-120 (single stage) and PH7-120, DPH7 (dual stage). The following is an illustration of ARC's typical driver's side inflator for the DCADH model:[32]



Dual Level CADH Hybrid Inflator

79.     This design is substantially similar to a common ARC hybrid passenger side airbag inflator, the PH7 shown in the image below:[33]



Dual Level PH7 (120) Hybrid Inflator

---

[32] ARC, Products, Dual Level CADH Hybrid Inflator (last accessed Apr. 21, 2022).
[33] ARC, Products, Dual Level PH7 (120) Hybrid Inflator (last accessed Apr. 21, 2022).

80.    The following are actual images of an ARC hybrid driver inflator:



*Top: Top-down view of an ARC hybrid toroidal driver inflator.*

*Bottom: Cross sectional view of an ARC hybrid toroidal driver inflator.*

81.    The following photos show the back side of the driver inflator which is centrally located on the back of the airbag module assembly (the side facing away from the driver) for the 2013-2017 Chevrolet Traverse. The photo on the right shows that same inflator photo zoomed-in on the label that identifies it as an ARC DCADH-C inflator:[34]

---

[34]  eBay, 2013-2014-2015-2016-2017 Chevrolet Traverse Driver Airbag (last accessed Apr. 21, 2022).

 

82.    Below are photos of an ARC hybrid front passenger inflator identified as an ARC PH7 used in the 2015-2017 Audi A3.[35] The photo shows the similarity to the driver side inflator used in the GM vehicle models cited above.





---

[35] Audi A3 Right Passenger Dash Bag, eBay.

83.    The inflators are attached to different airbag cushions, which are tailored to the size and shape needed for a driver or passenger module. For example, the image below is of the passenger side airbag in a 2015-2017 Audi A3 which was manufactured by Key Safety Systems (KSS), a predecessor of Joyson.[36]



84.    As noted, to function, an airbag needs the chemical propellant to create a controlled explosion. ARC has used ammonium nitrate as its propellant since at least 2001. Ammonium nitrate is a desirable propellant for an Automaker or part supplier because it affords a high percentage of gas in its combustion and is inexpensive. Ammonium nitrate is commonly used as a fertilizer and is well known for its use in making cheap explosives. Both NHTSA's own investigations, and a December 2015 version of ARC's Material Safety Data Sheet (MSDS) for its hybrid inflators, confirm as much.

85.    Because of its natural habit of changing shape and volume with

---

[36] *Id.*

temperature changes, ammonium nitrate is used in inflators only when it is precisely phase stabilized. Phase stabilized ammonium nitrate or "PSAN," suppresses volume changes that would otherwise occur with temperature cycling. In the face of an unexpected rise in pressure, such as a blocked ventilation exit orifice, PSAN burns exponentially faster than many other propellant chemicals.[37] PSAN's faster dynamic burning rate, or burning en masse, means that the gases can build up faster than the metal canister can handle if the ventilation exit orifices are inadequate or obstructed.

86.    Even though the causes of the ruptures were different in Takata's inflators, Takata's use of PSAN in its deadly airbag inflators focused the industry's attention on the potential for PSAN to be volatile. In 2019, ARC itself in a patent recognized that PSAN was "considered unacceptable" even in hermetically sealed hybrid inflators.[38] ARC, and indeed all Defendants, were aware of PSAN's risks and the explosive force that results from the speed of combustion. Thus, they knew that ARC's airbag inflator housing needed to, at least, incorporate features that mitigate

---

[37] PSAN is considered overly risky and inappropriate by most in the scientific, research, safety, Automaker, and supplier manufacturing communities. Thus, most inflator manufacturers now use a variant of guanidine nitrate as the fuel in their propellant in frontal impact airbag designs. Guanidine nitrate has been proven over the last two decades to be a safe and durable propellant chemical. A small number of airbag propellant manufacturers have used ammonium nitrate due to cost savings.
[38] Patent US 2019/0218155 A1, Non-Ammonium Nitrate Based Generants, filed Jan. 17, 2019, publ. July 18, 2019, at 2.

against structural failure due to excessive pressure. Thus, the inflators must be designed with a sufficient number of ventilation exit orifices in correct locations such that they will not be blocked.

87.    Based on a review of recalls from 2000 to present involving inflator ruptures, whether in the manufacturing facilities or in the field, such ruptures are exceedingly rare in designs that do not contain ammonium nitrate in the propellant. The bottom line is that ARC designed its Defective Inflators using a highly explosive and unstable propellant that it knew was associated with dangerous ruptures under certain circumstances and required properly designed and engineered ventilation measures. Thus, ARC and the other Defendants were aware and on notice that the inflators must be designed to withstand and avoid over pressurization of the inflator housing due to the presence of the propellant. This was a known mechanism of failure.

**D.    The Defect**

88.    Against this background, all ARC's Defective Inflators had a serious design defect or defects: the presence of asymmetrical and unstable weld "flash" in the interior of the inflator housing combined with insufficient ventilation using a single exit orifice. This design is what causes the ruptures, as explained in detail below.

89.    The housing components of the ARC hybrid inflators consist of an upper pressure vessel, a lower pressure vessel, and a center support. Each piece of the DCADH inflator sections is illustrated below:



*Above: A side-view drawing of sections of the ARC hybrid DCADH inflator sections.*

90.    During assembly, ARC joins each of these three pieces of metal together. During the relevant period, ARC's design process specifications provided for these component parts to be joined using friction welding; a process carried out pursuant to the specific designs of ARC, the Defendants, and the Airbag Module Suppliers. Friction welding generates heat through mechanical friction between a moving component and a stationary one, while at the same time applying a lateral force (or pressure), called an "upset," to the parts. This displaces and ultimately fuses the material. Friction welding is a process carried out pursuant to a specific design;

"no operator skill is involved."[39]



*Above: Examples of friction welding techniques.*

91.    The ARC hybrid inflators utilize three separate friction welds. The order in which the welds are performed are different for the driver and passenger inflators. For the driver's inflator, in the CADH and DCADH, the first friction weld is between the upper pressure vessel and the center support. The second friction weld is between the center support and the lower pressure vessel. The third friction weld joins the lower and upper pressure vessels together. Friction welds two and three are

---

[39] Thompson Friction Welding, "A Practical Guide to Friction Welding," Sept. 26, 2004, at 30.

performed during the same operation. All relevant driver side inflators are substantially similar in their design and manufacturing, and all were defective when they left ARC's facilities.



**Left: Friction weld (1). Right: Friction welds (2) and (3).**

92.    For the passenger's inflators, in the PH7-90, PH7-120 (single stage) and PH7-120, DPH7 (dual stage), the first friction weld is between the lower pressure vessel and the center support. The second friction weld is between the center support and the upper pressure vessel. The third and final friction weld joins the lower and upper pressure vessels together. Friction welds two and three are performed during the same operation. All relevant passenger side inflators are substantially similar in their design and manufacturing, and all were defective when they left ARC's facilities.



*Left: Friction weld (1). Right: Friction welds (2) and (3).*

93.    "Slag" or "flash," the excess metal that that collects at the seam or joint of the two pieces being adjoined, is a natural byproduct of most welding methods, including friction welding. In ARC's Defective Inflators, flash is created at each of the seams between the joined parts, both on the exterior and interior of the airbag inflator.

94.    Controlled and consistent flash formation is a normal and expected byproduct of the friction welding process. In the illustrations below, the flash is uniform and materializes in a "ram's horn" shape (so named because it resembles a ram's horn). Such flash is uniform, symmetrical, and stable. That is, it does not contain odd or irregular shaped pieces. It does not have pieces hanging on by thin, unstable connections, and thus, will stay in place. In other words, it will not block ventilation exit orifices or otherwise interfere with airbag deployment, an inherently turbulent process.



*3D Model showing center tube to lower pressure vessel flash in "ram's horn shape."*

95.    Notably, friction welding is a design choice that ARC made. Not all toroidal airbag inflators are joined using friction. There are multiple types of welding, including, for example, laser welding, which does not produce flash. And friction welding – when the proper components are matched with proper machinery, specifications, and techniques – can also produce uniform flash in the "ram horn" shape discussed above. That, however, is not what ARC chose.

96.    ARC designed a process that generated asymmetrical, brittle, and sometimes excess weld flash along the internal seams of its friction welds. If certain parameters, such as part-to-part alignment, rotational speed, the force applied to the parts being welded, or the machine's balance, among other things, are out of specification during the friction welding process, such asymmetrical flash will collect at the joint of the parts being welded. ARC's friction welding process allowed

for the chance that asymmetrical and brittle weld flash could form at the seams of any inflator. Without designing a procedure to confirm no irregular flash had formed, which it did not implement until 2018, whether or not a vehicle's inflator contains such irregular flash is unpredictable and unknown.

97.    From the introduction of its hybrid inflators in 2000, through 2017, ARC did not physically check the quality of the interior friction welds, nor did it have any controls in place to identify asymmetrical flash occurring inside of the Defective Inflators. The pictures below show the asymmetrical weld flash collected in the interior of an ARC inflator at the union of the center support and upper pressure vessel. Unlike the weld flash in the illustrations above, the flash at this point in the inflator is not symmetrical or uniform.

*Actual Picture of Asymmetrical Internal Weld Flash*



*Flash on the inner diameter of the support tube of*
*an exemplar ARC Defective Inflator*



*Excess asymmetrical weld flash at the support tube inner diameter to*
*upper pressure vessel interface in field collected ARC hybrid inflators*



98.    When the asymmetrical weld flash is exposed to the gas flow through the gas ventilation exit port generated during the deployment, pieces of the flash in proximity of the exit port are at risk of dislodging. If the dislodged weld flash is large enough to block the gas exit port, the dislodged weld flash restricts gas exiting and will result in an increase of pressure in the inflator housing. As the internal pressure of the inflator increases due to the gas exit port restriction, the toroidal metal housing

expands, deforms, and changes shape from the toroid shape to more of a ball shape until it reaches the point of rupture.

99.    During a driver side rupture of an ARC hybrid inflator, the inflator housing expands due to the excessive internal pressure. This stretches the center support because it is welded to the top and bottom portions of the inflator housing. Eventually the center support violently fractures in line with the gas flow, and the center support and the upper pressure vessel are propelled towards the occupant.

100.    When the inflator housing ruptures, internal components of the inflator can be ejected as gas pressure ventilates into the passenger compartment, which can injure or kill the occupants. In addition to propelling internal inflator components toward the driver, the entire module assembly may also break free of the steering wheel and strike the driver which can cause injury or death.

101.    In its recall of one manufacturing lot of ARC passenger-side inflators, Ford noted that, "[p]reliminary analysis indicates that weld flash from the inflator canister welding process at the Tier 2 inflator supplier may obstruct the gas exhaust port."[40] If the ARC welding process incorporated into the design of the inflators allows weld flash, or pieces of weld debris, to block exhaust ports, the PSAN can exacerbate the over-pressurization and lead to an explosive rupture.

---

[40] Ford, Recall No. 17V529, Part 573 Safety Recall Report, Aug. 31, 2017.

102.   This is a design defect, which can allow undetected pieces of weld flash to obstruct the single, static exhaust port and cause the airbag inflator to explode.

103.   As noted, a reasonable alternative design was to select a welding method or type of machinery that produced stable and uniform weld flash. But ARC had other options as well. It could have incorporated more robust pressure relief valves into its design or included multiple exit ports to the inflator. A pressure relief mechanism would have mitigated the dangers of both PSAN-related over-pressurization and ruptures caused by a restricted gas exit port.

104.   ARC was aware that utilizing a pressure relief mechanism would mitigate the dangers of both PSAN-related over-pressurization and those ruptures caused by a restricted single gas exit port. According to a *New York Times* article, as part of its efforts to mitigate the known dangers associated with PSAN, in the early 2000s, ARC's competitor, TRW, incorporated a pressure relief valve in its PSAN-based inflators that allowed gas to escape should the inflator begin to over-pressurize.[41]

105.   In fact, ARC has designed inflators that do contain such a mechanism. In February 2013, for example, ARC filed a patent entitled, "Variable Orifice

---

[41] "A Cheaper Airbag, and Takata's Road to a Deadly Crisis," N.Y. Times, Aug. 26, 2016.

Construction," that would allow the inflator to increase the size of the exit orifice when the internal gas pressure was rising.[42] Although the patent mentions that the flexible orifice size is needed because some propellants result in higher pressure than others, it does not mention the fact that the invention would also reduce the chance of a flash nugget blocking the orifice enough to cause a rupture.

106.   In December 2020, ARC implicitly acknowledged both that its current design allowed for weld flash to partially block the exit orifice and that its current design did not adequately ventilate excess gas when it filed a patent application entitled, "Airbag Inflator With Pressure Relief Valve and Increased Combustion Efficiency."[43]

107.   In the patent, ARC stated:

> Some existing inflator assemblies utilize a center support structure that requires two simultaneous welds, which is problematic in respect of manufacturing <u>and also increases the potential for weld particles to exit the inflator upon deployment</u>. Existing designs have also been configured to fragment during deployment as a consequence, in the event of excessive pressure increase within the inflator due to some failure or external condition or the like, these existing inflator designs

---

[42] U.S. Patent 8,770,621 B1, Variable Orifice Construction, filed Feb. 26, 2013, pub. July 8, 2014.

[43] U.S. Patent 2022/0185224 A1, Airbag Inflator With Pressure Relief and Increased Combustion Efficiency, filed Dec. 11, 2020, pub. June 16, 2022, at 10 (emphasis added).

can be potentially hazardous for vehicle occupants.[44]

108.   ARC continued, "[i]t would be desirable to provide an airbag inflator that reduces gaseous effluents with efficient combustion while incorporating additional safety features in respect of venting and unintended increased in internal pressure and weld particles."[45] ARC proposed a hybrid inflator design in which "[t]he multiple sub-chambers are connected to one another via control vents. A canister lid with vent holes encloses the energetics canister. A flow diverter is placed into the booster can retain the energetics cover to the energetics canister and to further direct and control pressure and flow before exiting the top vessel via a control orifice."[46]

109.   The inflator would also have flow diverters to "further direct and control pressure and flow before exiting the top vessel."[47] Finally, the inflator would have a pressure relief mechanism in the bottom portion of the inflator "in the event of excess internal pressure without any rupture of the inflator during a deployment event."[48] During manufacturing, ARC would conduct hydroburst tests to confirm that the pressure relief mechanism works in the case of an over pressurization.

---

[44] *Id*. (emphasis added).

[45] *Id*.

[46] *Id.*

[47] *Id*.

[48] *Id*.

110.    Further, ARC knew about the defect and the potential for inflator ruptures but failed to implement meaningful manufacturing process changes and effective quality control systems until 2018. In 2018, ARC implemented manufacturing process changes, including a borescope system to visually inspect 100 percent of the upper vessel to support tube friction welds prior to sale. Implementing this quality control measure sooner was a preventable means to stop Defective Inflators from reaching and endangering tens of millions of consumers.

111.    This is not the first time that ARC has been accused of improper/defective welding. During the infamous Takata recalls, the bankrupt successor entity to Takata Corporation, Reorganized TK Holdings Trust, sued ARC, alleging that ARC provided Takata's U.S. subsidiary, TK Holdings, Inc., with defective side airbag inflators which caused TK Holdings' customer (General Motors) to issue a recall on its vehicles manufactured during the period the defective inflators were supplied by ARC. TK Holdings, Inc. alleged, *inter alia*, damages arising from breach of contract.[49]

112.    As alleged by TK Holdings, Inc., "ARC's inflators failed due to improper/defective welding."[50] As aptly stated by TK Holdings, Inc., "[t]he inflators

---

[49] *Reorganized TK Holdings Trust v. ARC Auto., Inc*., Bankr. D. Del., No. 1:19ap50266, Complaint, June 24, 2019.
[50] *Id.*

provided by ARC were not reasonably fit for their intended, anticipated, or reasonably foreseeable use." Accordingly, the defective inflators suffered from the additional issue of poor process control.

### E.    NHTSA Concludes That ARC Inflators Are Defective

#### 1.    Preliminary Evaluation and Engineering Analysis

113.  In July 2015, NHTSA's Office of Defects Investigation ("ODI") opened a Preliminary Evaluation (PE15-027) into 490,000 ARC driver side hybrid airbag inflators manufactured between 2001 and 2004, based on the two ruptures it was aware of. In the opening resume, NHTSA stated the inflators "may rupture during frontal air bag deployment resulting in metal fragments being propelled into the passenger compartment." NHTSA opened the investigation because, in December 2014, it received notice of a rupture that occurred in 2009 involving a 2002 model year Chrysler Town & Country, as well as notice in June 2015 of a rupture in a 2004 model year Kia Optima. When NHTSA realized that both inflators were ARC hybrid inflators, it opened the investigation.[51]

114.  After requesting and receiving some information on design, manufacturing, and quality control processes covering the relevant inflators, NHTSA issued several standing general orders ("SGO" or "SGOs"), including SGO

---

[51] NHTSA, Investigation PE15-027, ODI Opening Resume, July 13, 2015.

2015-01, SGO 2015-01A, SGO-2015-02, and SGO 2015-02A. These SGOs were directed not only at ARC but also certain Automakers – including some of the Defendants – and required each entity to timely report information about field ruptures upon notice.

115.   In March 2016, NHTSA met with ARC at its Knoxville, Tennessee headquarters, a representative of the Hyundai-Kia Defendants, and the relevant Tier 1 supplier. On information and belief, as is custom in the industry, the Hyundai-Kia Defendants, the relevant Tier 1 supplier, and ARC communicated prior to meeting with NHTSA.

116.   NHTSA, ARC, each of the Airbag Module Suppliers, and the Defendants responsible for the vehicles affected by this issue (inflators manufactured between 2001 and 2004) continued meeting to determine how to evaluate the propensity for the Defective Inflators to fail. The result was a program whereby ARC, the relevant Defendants, and the relevant Airbag Module Suppliers collected and tested Defective Inflators from the field.

117.   Because the initial round of testing did not include a sufficient number of inflators, the Defendants expanded the collection efforts. The Defendants and NHTSA decided that the appropriate number of airbags to test was 459 inflators of each type. This would be a total of 918 inflators, 459 single-level CADH and 459

dual-level CADH. The relevant Defendants supplied VIN numbers for the vehicles at issue and agreed to a testing process. Roughly, the process went as follows: the Defendants located the relevant inflators and shipped them to ARC's lab in Knoxville, Tennessee, for testing. ARC inspected and x-rayed each inflator, deployed them in test tanks, and recorded any ruptures. ARC shared this data with both NHTSA and the Defendants.

118.   Ultimately, by May 2018, ARC's testing was complete, and it claimed that none of the inflators ruptured.

119.   While this process was underway, in August 2016, NHTSA upgraded the Preliminary Evaluation to an Engineering Analysis (EA16-003), which is a more in-depth, detailed investigation. During its Preliminary Evaluation, NHTSA learned that GM and Hyundai also used airbag modules that contain ARC hybrid driver inflators.[52] NHTSA upgraded and expanded the investigation to all ARC inflators installed in U.S. vehicles after learning about a fatal rupture in a 2009 Hyundai Elantra that occurred in Canada in July 2016.

120.   In its "ODI Resume" (a technical form completed as part of the NHTSA investigation process) announcing the Engineering Analysis, NHTSA noted the inflators involved in the three known field incidents had ruptured in "substantially

---

[52] NHTSA, Investigation EA16-003, ODI Opening Resume, Aug. 4, 2016.

the same manner" and were "assembled using substantially the same manufacturing process."[53] NHTSA's stated focus was to determine how many ARC driver inflators were in vehicles in the United States and to collect more ARC inflators from the field to test and evaluate them to determine a root cause.[54]

121.    When NHTSA opened EA16-003, it issued a series of information request letters to Tier 1 suppliers that utilized ARC's hybrid toroidal inflators, and the relevant Defendants. The letters focused on information for front airbag modules using hybrid toroidal shaped ARC inflators. In NHTSA's information request to ARC, NHTSA stated, "[t]o assist us at this stage of the investigation, we are requesting certain information concerning all toroidal shaped frontal air bag inflators manufactured by ARC that were subsequently supplied to a Tier 1 or other air bag system manufacturer, for incorporation into their completed air bag modules…from the start of production (SOP) up to the date of this letter."[55]

122.    NHTSA has not publicly released most of the documents filed in the EA16-003 investigation. It has posted the letters it sent to various Automakers, Tier 1 Suppliers, and ARC on its website, but not the companies' responses.

123.    At some point in 2016, NHTSA further learned that some of the LAT

---

[53] *Id.*
[54] *Id.*
[55] NHTSA, EA16-003, Ltr. to ARC, Aug. 9, 2016.

for ARC's inflators involved poor welds on passenger hybrid 7 (PH7) inflators. NHTSA accordingly sought information about this issue from ARC under SGO 2016-01. ARC met with NHTSA to address this issue as well.

124.   In October 2016, NHTSA published a letter it sent to ARC chastising the company for failing to respond to its requests. This strongly worded letter puts the lie to ARC's claims in its May 2023 letter that it has completely cooperated with NHTSA. The letter from NHTSA states, in part:

125.   Furthermore, beyond ARC's lax response to compulsory process, ARC's attitude and approach to NHTSA's investigation remains troubling. Since this investigation was opened, ARC has on more than one occasion questioned the necessity of providing certain information, failed to provide documents in a readable format, appeared nonchalant in its approach to developing a testing plan or protocol, and has advocated for the closure of the investigation without possessing or providing a full understanding of the root cause for at least one of the underlying inflator ruptures.

126.   Additionally, a number of incidents involving ARC's product have been brought to NHTSA's attention by vehicle manufacturers and other suppliers. These incidents range from testing failures to recalls and raise serious questions regarding the quality and integrity of ARC's air bag inflators. While vehicle manufacturers and

other suppliers have voluntarily notified NHTSA of these and other incidents without the need for a formal request, ARC has failed to take any steps to notify NHTSA of these incidents, or their potential relationship to the incidents under investigation. After NHTSA learned of one of these incidents earlier this year, NHTSA contacted ARC and indicated that the company needed to provide this type of information to NHTSA proactively. Instead of noting the serious nature of these incidents and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised NHTSA staff for indicating otherwise.

127.   Compounding ARC's failure to inform NHTSA of these matters, ARC has also failed to comply with Standing General Order 2015-02A, issued in the underlying Preliminary Evaluation, which requires ARC to file a report within five days of receiving notification of an inflator field rupture. On July 8, 2016, a fatal rupture occurred in Newfoundland, Canada. NHTSA was notified of this incident on by both Transport Canada and by Hyundai. Although ARC was clearly notified of the incident, as demonstrated by ARC's attendance at an inspection of the vehicle that occurred on July 26, 2016, ARC has failed to provide any report to NHTSA regarding that incident. As noted by the Standing General Order, failure to comply with that obligation calls for the imposition of daily civil penalties.

128. ARC's response to NHTSA's investigation to date does not demonstrate the behavior that NHTSA expects of manufacturers, much less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues. ARC has been given every consideration, yet has failed to respond in kind…[56]

129. In April 2017, NHTSA once again sought further information from ARC, this time through a special order with 56 requests for information directed at all of the inflators ARC had ever produced.

130. Shortly after NHTSA issued these requests, ARC, the Defendants, NHTSA, and Airbag Module Suppliers formed what they term the "Collaboration Team" or the "ARC Joint Task Force." The purpose was ostensibly to investigate the ruptures of ARC's Defective Inflators. Ultimately, the Collaboration Team presented its findings to NHTSA.

131. Although publicly available documents do not make it clear, it is apparent that the Collaboration Team determined that ARC's welding design was faulty. ARC admits that, following this presentation to NHTSA, it "implemented

---

[56] NHTSA, EA16-003, Ltr. to ARC, Re: ARC's Response to EA16-003, Oct. 4, 2016, at 3 (emphasis added).

changes to the weld schedules of the existing IFW friction welders and implemented an automated borescope inspection system." It also "invested in capital improvements through the acquisition of state-of-the-art Izumi friction welders." ARC agrees that these were "corrective actions." These changes are confirmed by documents included in the EA16-003 document request, which state that ARC implemented equipment and process improvements on all toroidal inflator assembly lines on January 31, 2018.

132.   In August 2020, NHTSA requested additional information specifically regarding the PH7 toroidal shaped hybrid front passenger airbag inflator "to facilitate its investigation of the potential risk of deployment-related field rupture."[57] Regarding the PH7 inflator, NHTSA focused on a time frame "defined by a) a starting point of June 1, 2014, the inflator build date of a confirmed field event, and b) the end point of January 31, 2018, the implementation date of equipment and process improvements by ARC on all toroidal inflator assembly lines."[58] NHTSA sent similar letters requesting information about the PH7 passenger hybrid inflator to vehicle manufacturers Volkswagen, BMW, Fiat Chrysler, GM, Toyota, Kia, and Hyundai.

---

[57] NHTSA, EA16-003, Ltr. to ARC Automotive, Inc., Aug. 18, 2020.
[58] *Id.*

133.   In April 2021, NHTSA posted a memorandum to the public file for EA16-003 stating that it was reviewing ARC's responses to redact all personally identifiable information and that these types of responses "are usually complex, contain large volumes of documents, and require additional time for review and redaction."[59] NHTSA asserted that, "[t]he public version of the response will be posted to this investigation file when available." The response has yet to be publicly posted.

134.   On August 31, 2022, NHTSA called a meeting that included ARC, all of the Defendants, and all of the Airbag Module Suppliers. At the meeting, NHTSA revisited the history of the investigation and indicated that it would issue further information requests. It issued those requests in December 2022 and sought information about ARC's process changes, as well as the "accept/reject quantities" from the time that ARC started using borescopes to check its interior welds. ARC responded to NHTSA in February of 2023. The "accept/reject" rates are not yet public.

135.   On April 25, 2023, NHTSA met with GM to inspect a 2017 Chevrolet Traverse in which the driver inflator ruptured during a crash. Two days later, on April 27, 2023, NHTSA issued a letter to ARC requesting that it recall all 67 million of its

---

[59] NHTSA, EA16-003, Memo. Re: Response to Information Request, Apr. 13, 2021.

Defective Inflators. In this letter NHTSA:

> tentatively concluded that a defect related to motor vehicle safety exists
> in the frontal driver and passenger airbag inflators under investigation
> that were produced before installation of borescopes on all toroidal
> inflator manufacturing lines in January 2018 ("subsequent
> inflators"). . .

NHTSA demanded that ARC issue a Part 573 Recall report to address the defect.

136.   NHTSA confirmed that through January 2018, ARC supplied 67 million of the Defective Inflators to six Tier 1 airbag system manufacturers. Of the 67 million, 11 million were manufactured by Delphi (now owned by AUTOLIV) under a license from ARC. The Defective Inflators have been installed in cars manufactured by at least 12 vehicle manufacturers.

137.   NHTSA confirmed what is outlined above that ARC's friction welding generates weld slag or flash. If that slag or flash breaks loose during deployment it will follow the air flow through the sole exit port. Because there is only a single exit port in ARC inflators, pieces of flash may (and sometimes do) block the exit port. This leads to a rupture of the airbag inflator and sends shrapnel into the vehicles and towards passengers.

138.   NHTSA noted (as discussed *infra*) that, to date, the Defendants have addressed the Defective Inflators only by issuing recalls limited to the lots associated with a failed airbag inflator. Despite all of this information and ARC's own claims

of cooperation, NHTSA noted that ARC had not determined there was a defect or that a recall is necessary.

139.   NHTSA explained that a defect is a motor vehicle or motor vehicle equipment that exposes the public to an "unreasonable risk of death or injury in an accident . . ." 49 U.S.C. § 30102(8). NHTSA concluded that a "defect that occurs in an essential component of a piece of motor vehicle equipment, such as in this matter involving a frontal air bag inflator, presents an unreasonable risk to safety." Stating the obvious, NHTSA determined that an "airbag inflator that ruptures when deploying in a vehicle is plainly defective." NHTSA also found that the number of ruptures and/or field events at issue were not "de minimis." Those events are discussed below in further detail.

## 2.   Early Injuries, Deaths, and Piecemeal Recalls

140.   There have been at least 10 known ruptures of ARC's Defective Inflators in vehicles, including seven driver inflators and three passenger inflators. Two of those ruptures resulted in driver fatality. Additionally, two passenger inflators ruptured during LAT at ARC's factory. Five of the ruptures resulted in significantly limited recalls of other vehicles that contained other inflators only from that lot. The most recent rupture resulted in a larger-in-scope recall by GM but was still isolated to one inflator variant. On information and belief, there have been multiple other

inflator ruptures, either in the field or in testing, that have not been publicized.

141.    The Defective Inflators themselves were manufactured at various ARC factories and include both dual-stage (which has a two-stage deployment based on the severity of the crash) and single-stage (which deploys at the same rate no matter the crash severity) inflators. They all, however, share common defects. For example, all the components were joined with friction welding that used the same or substantially similar parameters that produces asymmetrical flash on the interior seams of the inflator compartment. In fact, there are documented field and LAT ruptures on inflators produced from multiple manufacturing facilities, *infra*. Moreover, all the inflators have a single exit port, and none were designed with an adequate pressure relief mechanism as discussed above in ¶¶ 278-302 to prevent a rupture. All contained PSAN in their secondary propellant, posing a risk of an exponential increase in pressure and, consequently, the risk of a rupture. These facts strongly suggest a systemic design defect in the inflators rather than a manufacturing defect occurring at one location, for one lot, for a short period of time, due to a non-conforming assembly process.

142.    Little is publicly known about the ten field ruptures. News reports have largely reported only on the information provided by NHTSA in the few investigation documents it made public. News reports about the two fatal incidents

do not include information about the drivers or their locations.

143.    The following is what is known about each rupture and recall thus far:

**a.    The 2009 "Dutton Rupture"**

144.    In January 2009, in Ashtabula County Ohio, an ARC DCADH ruptured in a 2002 Chrysler Town and Country minivan severely injuring Lois Dutton.[60] According to Ms. Dutton, "[i]t broke my jaw in three places. Collapsed a lung." The inflator was a dual-stage hybrid inflator manufactured at ARC's Knoxville, Tennessee, facility.[61] It even sent shrapnel through her chest and out of her back. Ms. Dutton spent three months in a medically induced coma after the incident and faced hundreds of thousands of dollars in medical bills.

145.    The Dutton ARC rupture was attributed to a "single isolated event" and no actions were taken. This occurrence and write-off as a "single isolated event" is very similar to what occurred in the Takata recall with what is known as Event Zero. Event Zero was the first field rupture of a Takata PSAN PSDI inflator, and instead of performing a thorough investigation, Takata and Honda wrote it off as an "anomaly" and only took any action when additional field ruptures took place three years later.

---

[60] NHTSA, Investigation PE15-027, ODI Opening Resume, July 13, 2015.
[61] *Id.*

### b.    The 2014 Kia Optima Rupture

146.    On April 8, 2014, the ARC driver inflator in a 2004 Kia Optima ruptured during a frontal impact crash in New Mexico.[62] The driver suffered serious injuries. The inflator was a single-stage inflator made at ARC's Knoxville, Tennessee, facility.[63] The driver sued Kia Corp. and Kia America, Inc., under their previous names, and the lawsuit was settled quickly. Kia did not issue a recall. In its investigation, NHTSA indicated that this inflator was placed in a Delphi Automotive Systems Corp. airbag module. Delphi was acquired by AUTOLIV in 2009.

### c.    The 2016 Hyundai Elantra Rupture

147.    On July 8, 2016, the driver of a 2009 Hyundai Elantra was killed in Canada when an ARC driver inflator exploded during a crash.[64] This inflator was a single-stage inflator made in ARC's China facility.[65] Hyundai later recalled 2,022 MY 2009 Elantra vehicles in Canada, but did not issue a recall in the United States.[66] This recall was performed to collect parts for Transport Canada defect investigation 3280-38-10 in an effort to aid in the analysis by Hyundai and Transport Canada. The

---

[62] *Chavez v. Kia Motors Corp.*, D.N.M., No. 1:15-cv-00462, First Amended Complaint, June 25, 2015.

[63] NHTSA, Investigation PE15-027, ODI Closing Resume, Aug. 25, 2016.

[64] "1st Recorded Canadian Fatality from Airbag Inflator Rupture Under Investigation," CBC News, Aug. 4, 2016.

[65] NHTSA, Investigation EA16-003, ODI Opening Resume, Aug. 4, 2016.

[66] Transport Canada, Recall No. 2018-173, Apr. 11, 2018.

recovery program ended on February 5, 2020, with a note stating: "No safety defect has been identified with these vehicles and this action is not being conducted under the requirements of the Motor Vehicle Safety Act."

### d.   The 2017 BMW Lot Qualification Rupture and Recall

148.   On February 8, 2017, a Tier 1 supplier, Key Safety Systems notified BMW that an ARC DPH-7 passenger hybrid inflator intended for BMW ruptured during a quality check or LAT at an ARC facility on January 29, 2017.[67] The DPH-7 inflator was manufactured at ARC's Reynosa, Mexico, facility.[68] On March 21, 2017, BMW issued Recall 17V-189 for 36 vehicles equipped with ARC DPH-7 passenger front inflators.

149.   The DPH-7 uses the same friction welding process as both the CADH and DCADH. According to the Part 573 Safety Recall Report:

> Depending on the circumstances, impaired gas flow could create excessive internal pressure, which could result in the body of the inflator rupturing upon deployment. Metal fragments could pass through the air bag cushion material, which may result in injury or death to vehicle occupants.

150.   This recall, however, fails to include all BMW Class Vehicles with Defective Inflators, depriving Class Members of notice and a remedy, and it fails to

---

[67] BMW, Recall No. 17V189, Part 573 Safety Recall Report, Mar. 21, 2017.
[68] NHTSA, Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.

compensate all Class Members, even the ones included in the recall, for the diminished value of their vehicles.

### e.    The 2017 Ford Lot Rupture and Recall

151.    On July 31, 2017, Ford was notified that an ARC PH7-120 dual-stage passenger inflator had ruptured during LAT at ARC's facility.[69] Ford's airbag module was assembled by Takata Corporation, which was subsequently acquired by Key Safety System and later incorporated into Joyson Safety System. According to ARC's presentation to NHTSA, the PH7 inflators were manufactured in four of its facilities: Knoxville, Macedonia, China, and Mexico.[70]

152.    On August 31, 2017, Ford issued Recall 17V-529 for 650 F-150 and Mustang vehicles equipped with ARC's PH7-120 dual stage passenger inflator which uses the same friction welding process as the DPH-7, CADH and DCADH. According to the Part 573 Safety Recall Report:

> July 31, 2017, The Tier 1 airbag module supplier notified Ford of an abnormal deployment of a passenger Airbag (PAB) inflator during a Lot Acceptance Test (LAT) conducted at the supplier's engineering facility. The inflator ruptured during full output at +65 Celsius.

153.    During August of 2017, the concerns outlined in the Part 573 Safety

---

[69] Ford, Recall No. 17V529, Part 573 Safety Recall Report, Aug. 31, 2017.
[70] NHTSA, Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.

Recall Report were reviewed by Ford's Critical Concern Review Group ("CCRG") and its preliminary analysis indicates that weld flash from the inflator canister welding process at the Tier 2 inflator supplier may obstruct the gas exhaust port. LAT frequency was increased, and a Design of Experiments was initiated to further evaluate potential factors.

154. This recall, however, fails to include all Ford Class Vehicles with Defective Inflators, depriving Class Members of notice and a remedy, and it fails to compensate all Class Members, even the ones included in the recall, for the diminished value of their vehicles.

### f.    The 2017 Chevy Malibu Rupture and Recall

155. On September 22, 2017, an ARC driver inflator ruptured in a 2011 Chevrolet Malibu during a crash in Pennsylvania.[71] GM recalled 1,145 model year 2010-2011 Chevrolet Malibu vehicles built with inflators from the same lot as the inflator that ruptured (Recall 19V019). GM did not specify the type of inflator but stated that it was manufactured in Mexico.[72] According to ARC's submission to NHTSA, the driver inflator that is manufactured at ARC's Mexico facility is a

---

[71] *McQuaide v. Gen'l Motors LLC*, Pa., Allegheny Co. Ct. Com. Pleas, No. GD-18-007744, Third Amended Complaint, Jan. 29, 2019.
[72] Gen'l Motors, Recall No. 19V019, Part 573 Safety Recall Report, Jan. 31, 2019.

CADH (*i.e.*, ADH-C).[73] The airbag module was manufactured by TRW Automotive Holdings Corp., which has since been acquired by ZF Friedrichshafen AG to form what is commonly referred to as ZF-TRW.

156.   According to NHTSA, an ARC passenger hybrid inflator manufactured on June 1, 2014, ruptured in the field. NHTSA did not specify the make, model, and model year vehicle or the date of rupture.[74]

157.   This recall, however, fails to include all GM Class Vehicles with Defective Inflators, depriving Class Members of notice and a remedy, and it fails to compensate all Class Members, even the ones included in the recall, for the diminished value of their vehicles.

### g.    The 2021 Chevy Traverse Rupture and Recall

158.   On August 15, 2021, a driver in Calumet, Michigan, was killed due to a rupture of the ARC driver hybrid inflator in her 2015 Chevrolet Traverse. The victim, who was driving with two of her children as passengers, collided with an oncoming vehicle that crossed into her lane, and her airbag deployed. According to the police investigation:

[i]t appeared that the driver's side airbag malfunctioned causing it to

---

[73] NHTSA, Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.

[74] *See, e.g.,* NHTSA, Investigation EA16-003, Investigation Response Ltr. to Volkswagen Group of Am., Inc., Sept. 14, 2020.

detach from the steering column and sent metal fragments into the driver's compartment of the vehicle. The igniter for the front driver's side airbag was found on the passenger side dashboard. There was also metal shrapnel on the driver's side dash, in the instrument cluster and markings on the driver's side roof which appeared to come from the driver's side airbag.[75]

159.   The police investigation report noted that the autopsy of the victim found parts of the metal airbag inflator lodged in her neck. The other passengers in the victim's vehicle, including an unbelted right front passenger and occupants in the second and third row seats, survived the crash.

160.   GM sent a contract field investigator to examine the vehicle on September 8, 2021, and, on September 14, 2021, another GM field investigator accompanied by the police investigator performed x-rays on the metal shards that were removed during the autopsy. Further inspection of the vehicle and airbag pieces were examined by counsel representing the victim's family, GM, ARC, and Toyoda Gosei (the Tier 1 supplier to GM) on October 27, 2021. The investigation report includes a photograph of the ruptured inflator, which is unrecognizable as an inflator due to the extent of the damage, as depicted below:

---

[75] Houghton Co. Sheriff's Off., Incident Report, Aug. 15, 2021.



161.   GM subsequently issued a recall of 552 model year 2008-2017 Buick Enclave vehicles and 2013-2017 Chevrolet Traverse vehicles (Recall 21V782).[76] As with its previous recall, GM recalled only inflators made from the same lot as the ruptured inflator that were used either as original equipment or replacement inflators. GM did not specify the type, stage, or manufacturing location for the inflator.

162.   This recall, however, fails to include all GM Class Vehicles with Defective Inflators, depriving Class Members of notice and a remedy, and it fails to compensate all Class Members, even the ones included in the recall, for the diminished value of their vehicles.

**h.    The Second 2021 Chevy Traverse Rupture and Recall**

163.   On October 13, 2021, NHTSA confirmed that, just south of Lexington,

---

[76] Gen. Motors, Recall No. 21V782, Part 573 Safety Recall Report, Oct. 7, 2021.

Kentucky, there was another rupture of an ARC hybrid driver inflator involving a second 2015 Chevrolet Traverse.[77] Based on this incident GM issued Recall 22V-246 on April 14, 2022, for 2,687 vehicles including:

      a.    2015 Buick Enclaves (542)

      b.    2015 Chevrolet Traverses (1183)

      c.    2015 GMC Arcadias (962)

164.    The chronology listed in the Recall 22V-246 Part 573 report states:[78]

On November 9, 2021, GM received a claim letter from an attorney representing the owner of a 2015 model year Chevrolet Traverse that was involved in a crash. On February 18, 2022, the claimant alleged that the front-driver airbag inflator in the vehicle ruptured during the crash.

GM was provided an opportunity to inspect the vehicle on March 23, 2022. GM determined, at that inspection, that the front driver airbag inflator in the subject vehicle ruptured during the crash deployment.

On April 7, 2022, GM's Safety and Field Action Decision Authority decided to conduct a safety recall on all front driver airbag modules containing an inflator from the same manufacturing lot as the inflator under investigation. GM is continuing to investigate this incident. GM's investigation has not identified another rupture allegation involving the vehicles in this recall population.

165.    This recall, however, fails to include all GM Class Vehicles with

---

[77] *Second driver killed by airbag inflator from Tennessee's ARC*, Autoblog, Oct. 14, 2021, https://www.autoblog.com/2021/10/14/arc-airbag-inflator-death-gm-nhtsa-investigation/ (last accessed July 20, 2022).
[78] GM, Recall No. 22V246, Part 573 Safety Recall Report, Apr. 14, 2022.

Defective Inflators, depriving Class Members of notice and a remedy, and it fails to compensate all Class Members, even the ones included in the recall, for the diminished value of their vehicles.

### i.    The 2021 Audi A3 Rupture and Recall

166.    On December 18, 2021, the ARC passenger hybrid inflator in a 2016 Audi A3 ruptured during a crash in California, causing severe laceration injuries to the front seat passenger. An individual personal injury case was filed and remains pending.[79] In July 2022, VW recalled 1,216 vehicles, noting that although it had not yet determined a root cause, it was only recalling inflators from the same "suspect batch."[80] According to photos of an exemplar airbag installed in the 2015-2017 Audi A3, the passenger inflators are ARC PH7 hybrid inflators manufactured in Macedonia.[81]

167.    This recall, however, fails to include all Audi Class Vehicles with Defective Inflators, depriving Class Members of notice and a remedy, and it fails to compensate all Class Members, even the ones included in the recall, for the diminished value of their vehicles.

---

[79] *Barbone v. Khijniak*, Cal., Orange County Super. Ct., No. 30-2022-01254070-CU-PA-CJC, Apr. 8, 2022.

[80] VW, Recall No. 22V543 Part 573 Safety Recall Report, July 27, 2022.

[81] eBay, Audi A3 Right Passenger Dash Bag SRS Inflator Stk 21262 (last accessed Mar. 3, 2022).

### j.    The 2023 GM Rupture and Recall

168.    On March 22, 2023, a driver side inflator in a 2017 Chevrolet Traverse ruptured in Michigan. This module was produced by Toyoda Gosei. On May 10, 2023, GM instituted a recall (NHTSA No. 23V334), stating that it:

> decided that a defect which relates to motor vehicle safety exists in certain 2014-2017 model year Buick Enclave, Chevrolet Traverse, and GMC Acadia vehicles. In these vehicles, the front-driver airbag inflator may contain a supplier manufacturing defect that may result in inflator rupture during deployment.

> Description of the Safety Risk: An inflator rupture may cause metal fragments to pass through the airbag and into the vehicle interior, which may result in injury or death to vehicle occupants.

> Description of Remedy Program: Dealers will replace the front-driver airbag module.[82]

169.    GM concluded that the "MC" variant inflator in these vehicles may rupture and "cause metal fragments to pass through the airbag and into the vehicle interior, which may result in injury or death to vehicle occupants." GM committed that once the parts are available, its dealers will replace the Defective Inflators in the front driver side but specified that only "MC" variant inflators were included. This recall included 994,000 vehicles.

170.    This recall, however, fails to include all GM Class Vehicles with Defective Inflators, depriving Class Members of notice and a remedy, and it fails to

---

[82] GM, Recall No. 22V334, Product Safety Recall Report, May 10, 2023.

compensate all Class Members, even the ones included in the recall, for the diminished value of their vehicles.

### k.    International Events

171.    In addition to the previously discussed July 2016 driver side air bag inflator rupture in a 2009 Hyundai Elantra in Canada, on October 16, 2017, a passenger side airbag ruptured in a 2015 Volkswagen Golf in Turkey. The Joyson Defendants produced the airbag module, which also contained a Defective inflator manufactured in ARC's Knoxville, Tennessee facility.

### l.    Recall Summary

172.    The following chart summarizes the lot-based recalls, which cover only 1.2 million of the 67 million affected vehicles.

| Recall | Date | Manufacturer | Affected Vehicles | Population |
|--------|------|--------------|-------------------|-----------|
| 17V-189 | 03/21/2017 | BMW | 2017 BMW X5 sDrive35i, X5 xDrive35i, X5 xDrive50i 2017 BMW X5 xDrive 35d 2017 BMW X5 xDrive40e | 36 |
| 17V-529 | 08/31/2017 | Ford | 2017 Ford F150 2017 Ford Mustang | 650 |
| 19V-019 | 01/31/2019 | General Motors | 2010-2011 Chevrolet Malibu | 1,145 |
| 21V-782 | 10/21/2021 | General Motors | 2008-2017 Buick Enclave 2013-2017 Chevrolet Traverse | 552 |
| 22V-246 | 04/14/2022 | General Motors | 2015 Buick Enclave 2015 Chevrolet Traverse | 2,687 |
| 22V-543 | 07/27/2022 | Volkswagen | 2016 Audi TT Roadster 2016 Audi TT Coupe 2016 Audi S3 Sedan 2016 Audi R8 Coupe 2016 Audi A3 Sedan 2016 Audi A3 e-tron 2016 Audi A3 Cabriolet 2016 Volkswagen Golf Sportwagen 2016 Volkswagen Golf R 2016 Volkswagen Golf GTI 2016 Volkswagen Golf A7 2016 Volkswagen E Golf | 1,216 |
| 23V334 | 5/10/23 | General Motors | 2014-2017 Buick Enclave 2014-2017 Chevrolet Traverse | 994,000 |

| Recall | Date | Manufacturer | Affected Vehicles | Population |
|--------|------|--------------|-------------------|------------|
| | | | 2014-2017 GMC Acadia | |
| | | | **Total Recall Population** | **1,286,000** |

173.   As evidenced above, the ARC hybrid inflators that have ruptured thus far vary in type, stage, and location of manufacture. Despite knowledge of the Defective Inflators and the growing number of ruptures, ARC has not recalled their demonstrably unsafe Defective Inflators, the Airbag Module Suppliers did not recall their air bag modules containing the Defective Inflators, and the Defendants did not recall all their vehicles fitted with the Defective Inflators. As stated above, the Defendants have issued only very limited recalls following actual ruptures, a pattern that follows the devastating Takata airbag inflator recalls that went on for many years and needlessly endangered vehicle occupants and resulted in injuries and deaths. Instead of proactively taking steps to ensure their vehicles are safe as they are duty bound to do, the Defendants' response has been reactive and wholly inadequate.

174.   As of May 31, 2023, there has been limited public disclosure of the data requested by NHTSA from the Defendants or ARC. The original requests for information surrounding the ARC inflator ruptures are dated August 4, 2016. The most recent documents provided to the public on the NHTSA website are dated from December 2022 and only include requests for additional information.

175.   According to a memo dated April 13, 2021, NHTSA states:

The manufacturer's response to the Office of Defect Investigation (ODI)'s information request for this investigation is being reviewed and redacted to remove all personally identifiable information (PII) as required by federal law. These responses are usually complex, contain a large volume of documents, and require additional time for review and redaction. The public version of the response will be posted to this investigation file when available. While ODI's investigation is ongoing, we recommend that you periodically review this investigation file for additional documents and updates.

176.   Over two years have passed since NHTSA claimed the public version of the documents would be made available and as of May 31, 2023, only 100 documents have been made public, most of which are NHTSA's requests, in stark contrast to ARC's representation that they turned over 2 tera-bytes of material during the investigation.

177.   There are only two approaches available: (1) Recall all ARC hybrid toroidal inflators OR (2) wait until another field rupture takes place and recall the inflators of the same lot. The Defendants' "Wait and See" approach places drivers and passengers of vehicles that utilize an ARC hybrid toroidal inflator at risk. The two drivers of the 2015 Chevrolet Traverses involved in the August and October 2021 accidents were the latest guinea pigs the Defendants used to identify two defective lots of ARC inflators and they will not be the last unless all ARC Defective Inflators are recalled.

178.   In fact, in the October 4, 2016, letter from NHTSA to ARC's Chief Executive Officer, ARC's position on the seriousness of the matter was called out quite clearly by Michael Brown, Acting Director Offices of Defect Investigation:[83]

> ARC's response to [NHTSA's] investigation to date does not demonstrate the behavior that NHTSA expects of manufacturers, much less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues.

179.   The Class Vehicles are not safe to drive. Due to Defendants' failures, Plaintiff and Class Members are left with poor options: to be without the use of a vehicle; purchase, lease, or rent a new vehicle until Defendants first issue and then complete the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time. These are all, obviously, entirely unacceptable alternatives.

## F.    The Class Vehicles

180.   Attached as Exhibit E is a table that identifies, to the best of Plaintiffs' knowledge, and without the benefit of discovery, the Class Vehicles equipped with ARC's Defective Inflators by make, model, and model year.

## G.    Defendants' Concealment of the Defect

181.   Like ordinary consumers, Plaintiffs reasonably believed when purchasing their Class Vehicles that the vehicles were equipped with safe airbags

---

[83] NHTSA, EA16-003, Ltr. to ARC, Aug. 9, 2016.

that did not have a dangerous propensity to shoot shrapnel into their faces, necks, torsos, and limbs or those of other vehicle occupants. Accordingly, the ordinary reasonable consumer would have considered the Inflator Defect to constitute an important and material part of deciding whether to spend money to purchase or lease a Class Vehicle.

182.   Defendants were aware that consumers did not expect their airbags to be defective and had readily available means to convey that information to Plaintiffs and the Class—including through on-vehicle labeling, stickers, and placards, through owner manuals, brochures, and pamphlets, through advertising for the Class Vehicles, and through full and complete disclosure by way of recalls. Plaintiffs and the Class were exposed to such types of informational materials prior to purchasing or leasing their Class Vehicles, at the time of purchase or lease (through interactions with Defendants' sales employees and other agents), and/or every day they sat in their Class Vehicles. Indeed, Defendants had one obvious location to convey a warning about an airbag defect, on the steering wheel itself, an item the driver cannot help but see before ever driving the car.

183.   Defendants nonetheless chose not to warn about or disclose the defect at any point in time. The Defendants' concealment succeeded because each entity in the chain between ARC and the Defendants remained silent about the defect—

resulting in the public, prospective purchasers and lessees, automobile dealerships, automobile retailers, and automotive repair and service facilities remaining unaware of the Inflator Defect, which successfully prevented any warning to Plaintiffs and the Class. The foreseeable and intended effect of the Defendants' concerted silence was that they all continued to profit from the manufacture, marketing, sale, service, and use of the Defective Inflators and Class Vehicles equipped with those inflators—with consumers bearing all the safety risks and suffering economic losses as a result.

184. Defendants intended to mislead and in fact misled reasonable consumers—including Plaintiffs and the Class—through their concealment of the Inflator Defect. Defendants did so with the intent to generate and increase sales of the Class Vehicles, thereby increasing Defendants' relative share of the automotive components and automobile markets.

### H.  Economic Injury to the Class

185. The Class Vehicles were worth less than the prices the Class Members paid for them. Neither the market nor any reasonable consumer would ignore the material danger involving an airbag shooting metal shrapnel into the driver and passengers when assessing the value of an automobile and whether to purchase or lease it. Consequently, Plaintiffs paid more for their Class Vehicles than they otherwise would have because of the Inflator Defect, or they purchased vehicles that

they otherwise would not have purchased.

186. By concealing the Inflator Defect, Defendants distorted and misrepresented the true value of every Class Vehicle. Every Plaintiff and Class member received a Class Vehicle with different characteristics and of different and substantially lesser value than they reasonably believed they were receiving. Accordingly, Plaintiffs and the Class did not realize the benefit of their bargain in purchasing and leasing the Class Vehicles, and their expectations as ordinary reasonable consumers were not met.

187. For these reasons, every Class Vehicle was worth less than what Plaintiffs and Class Members paid for them.

## IV.    Tolling of the Statute of Limitations

188. Plaintiffs and the Class had no knowledge of the misconduct and concealment alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until August 2020 when the NHTSA expanded its Engineering Analysis to include "toroidal shaped hybrid air bag inflators, both passenger and driver side" and requested additional information from ARC specifically regarding the PH7 toroidal shaped hybrid front passenger airbag inflator "to facilitate its investigation of the potential risk of deployment-related field rupture."

189.   Plaintiffs and Class Members are consumers who purchased or leased Class Vehicles. No information in the public domain was available to the Plaintiffs and the members of the Class prior to August 2020 that revealed sufficient information to suggest that Defendants were involved in the misconduct or concealment alleged herein. Therefore, the statute of limitations did not begin to run because Plaintiffs and the Class did not and could not discover their claims.

190.   In the alternative, the statute of limitations did not begin to run because the Defendants fraudulently concealed the Defective Inflators until at the earliest, August 2020. On information and belief, ARC and the Vehicle Manufacturer Defendants have known of the defects in their airbags since at least 2015. Defendants knew of the defects well before the Plaintiffs and many of the Class Members purchased the Class Vehicles, and have concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Airbag Defect.

191.  Plaintiffs and the Class had no means of obtaining any facts or information concerning any aspect of ARC's dealings with the Airbag Module Suppliers and Defendants, much less the fact that they had engaged in the misconduct and concealment alleged herein. For these reasons, the statute of limitations as to Plaintiffs' and the Class's claims did not begin to run and has been tolled with respect to the claims that Plaintiffs and Class Members have alleged in

this Complaint.

## V.    Class Action Allegations

192.   Unless otherwise stated, the term "Class" refers jointly and severally to the Class and to each of the State Subclasses. Excluded from the Class are: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class counsel, and (e) any person who timely and properly excludes himself or herself from the Class.

### A.    Nationwide Class

193.   Pursuant to Federal Rule of Civil Procedure ("Rules") 23(a), 23(b)(2), and 23(b)(3), Plaintiffs bring this action on behalf of a proposed Class defined as follows: "All consumers in the United States who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC between 2001 and 2018."[84]

---

[84] At this early stage and without the benefit of discovery, Plaintiffs cannot determine with certainty each vehicle by make, model, and model year equipped with the Defective Inflators but have included those about which they are reasonably confident. Plaintiffs may amend their pleadings to add vehicles if they are identified in the discovery process.

### B.    State Subclasses

194.    The State Subclasses consist of: "All consumers in their state of residence who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC between 2001 and 2018." The State Subclasses do not include: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class counsel, and (e) any person who timely and properly excludes himself or herself from the Class.

195.    Consistent with Fed. R. Civ. P. 23(c)(5) which sanctions the creation of subclasses "[w]hen appropriate," Plaintiffs reserve their right to modify the Class and the State Subclasses as discovery progresses and at the class certification stage.

### C.    Numerosity (Fed. R. Civ. P. 23(a)(1))

196.    The members the proposed Class(es) are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Although the precise number of Class Members is unknown to Plaintiffs, on information and belief, the Class would easily number in the millions. Millions of Class Vehicles spanning nearly 20 model years potentially contain

Defective Inflators. The Class and/or classes are thus comprised of numerous, geographically dispersed members who cannot be practicably joined.

197. The true size of the Class and/or Classes are ascertainable through the Defendants' business records and by other means.

### D.    Typicality (Fed. R. Civ. P. 23(a)(3))

198. Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and the Class and/or State Subclasses all purchased or leased a Class Vehicle containing Defective Inflators. All received less than the full value Class Vehicles due to the Inflator Defect and Defendants' representations and/or Defendants' omissions. Class Members, like Plaintiffs, would not have purchased the Class Vehicles or paid as much had Defendants not misrepresented the safety of the Class Vehicles or concealed and omitted to disclose the Inflator Defect, which was unknown to Plaintiffs and Class Members. And Plaintiffs and Class Members were exposed to the same or substantially similar misrepresentations and to the same omissions—namely, concealment of the Inflator Defect. In short, the claims all arise from a single course of conduct and each Class member would individually make similar legal and factual arguments to establish Defendants' liability.

199. There are no defenses available that are unique to the Plaintiffs.

**E.    Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) & 23(b)(3))**

200.    Plaintiffs and the Class are united by a community of interest in obtaining appropriate remedies, including injunctive relief, repair, or replacement of the Class Vehicles or Defective Inflators, restitution, damages, and other available relief designed to redress Defendants' wrongful conduct. This action involves questions of law and fact that are common to the Class(es) that are susceptible to common answers and that predominate over any individual questions specific to any Class Members. These include:

d.    Whether the ARC airbag inflators are defective;

e.    Whether the Class Vehicles are equipped with Defective Inflators;

f.    Whether Defective Inflators in the Class Vehicles pose an unreasonable safety risk or are otherwise material to reasonable consumers;

g.    Whether an ordinary reasonable consumer would have purchased or leased a Class Vehicle had he or she known of the Defective Inflators;

h.    Whether an ordinary reasonable consumer would have paid less money to purchase or lease a Class Vehicle had he or she known

of the Defective Inflators;

i.    Whether the Class and Subclass members were denied the benefit of their bargain as a result of the undisclosed defect;

j.    Whether Defendants had actual or constructive knowledge of the defect;

k.    When Defendants first had actual or constructive knowledge of the defect;

l.    Whether Defendants had a duty to disclose the Defective Inflators before or at the time Plaintiffs and the Class(es) purchased or leased their respective Class Vehicles;

m.    Whether Defendants had and have an ongoing duty to disclose the defect;

n.    Whether Defendants breached their express and implied warranties for the Class Vehicles and Defective Inflators;

o.    Whether Defendants violated governing laws prohibiting unfair and deceptive trade practices and other similar consumer protection laws of Plaintiffs' and the Class Members' respective jurisdictions;

p.    Whether Defendants breached other duties or violated other

applicable laws by their representations and/or by their omissions, including concealment of the Defective Inflators;

q.    Whether Defendants breached their obligations to provide timely repairs for the Class Vehicles;

r.    Whether Defendants should be declared legally and financially responsible for notifying the Class and Subclass members of the true and complete nature and extent of the Defective Inflators;

s.    Whether Defendants should be declared legally and financially responsible for notifying Class and Subclass Members of their right to reimbursement from Defendants for the costs incurred in diagnosing, repairing, and replacing the Defective Inflators in the Class Vehicles;

t.    Whether and to what extent Defendants are obligated to pay actual and consequential damages to the Class and Subclass Members as a result of the Defective Inflators;

u.    Whether Defendants fraudulently concealed the Defective Inflators;

v.    Whether Defendants misconduct was knowing and willful;

w.    Whether Defendants should be obligated to pay punitive

damages in connection with the claims brought in this action, and if so, the amount of those damages;

x.     Whether Defendants were unjustly enriched by receiving Plaintiffs' and the Class Members' money for the Class Vehicles;

y.     Whether Defendants should be ordered to disgorge all or part of the monies received from Plaintiffs and the Class in exchange for the Class Vehicles;

z.     Whether Plaintiffs and the Class are entitled to damages, injunctive relief, restitution, or other relief sought in this Complaint; and

aa.    The amounts to which Plaintiffs and the Class are entitled.

201.   The factual and legal issues identified above (a) remain common to the Class, (b) arise from a common course of conduct and systemic policy decisions made by Defendants, (c) predominate in number and importance over questions that may not be common to the class, and (d) preclude neither class-wide calculation of damages nor the methodological determination of how such damages should be allocated among Class Members.

**F.     Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**

202.   Plaintiffs are adequate Class representatives because their interests do

not conflict with the interests of the Class Members. Plaintiffs commit to protecting the interests of the Class(es) without exercising personal interest or otherwise acting in a manner inconsistent with the best interests of the Class(es) generally. Plaintiffs have retained attorneys with exceptional experience in complex litigation, including extensive class action experience and experience in handling consumer protection cases and product liability cases, including automobile defect claims. The firms and lead counsel for the firms retained by Plaintiffs also have substantial trial experience, individually and collectively. Plaintiffs and their attorneys will responsibly, ethically, and vigorously advocate on behalf of the Class(es) and Plaintiffs' counsel have ample resources to do so.

### G.    Ascertainability

203.    The Defective Inflators manufactured by ARC are identifiable, discrete physical products that remain essentially unchanged when incorporated into a Class Vehicle. As a result, the Defective Inflators follow a traceable physical chain of distribution from ARC to the Airbag Module Suppliers to the Defendants to automobile dealerships and retailers and then to Plaintiffs and the Class.

204.    Defective Inflators that are incorporated into the assembly contain markings identifying ARC as the manufacturer on a small label on the component. Defective Inflators can therefore be physically traced through the supply chain.

205.   The identities of Class Members are ascertainable from various sources including Defendants' production and distribution records, Polk automotive data, vehicle ownership records, government ownership records, or via simple notice by publication.

**H.    Superiority**

206.   The proposed class action is superior to the other means available to the Class to obtain relief. The damages suffered by individual Class Members are relatively small compared to the burden and expense of individual litigation of the claims described here against Defendants so that making the class whole in the absence of a class action is unlikely and impracticable.

207.   This means Class Members have relatively less interest in individually controlling the prosecution of separate actions and it cannot be said that the interests of individuals pursuing individual cases in conducting separate lawsuits is so strong as to call for denial of a class action. Without class certification, the prosecution of separate consumer actions by individual Class Members would be impracticable and financially difficult and, therefore, unlikely.

208.   Denial of class treatment runs the risk of establishing incompatible standards of conduct for Defendants, discouraging the prosecution of meritorious but small claims, and it may result in adjudications which would be dispositive of

the interests of other Class Members who are not parties to the adjudication, or otherwise substantially impair the ability of Class Members (and Defendants) to protect their rights and interests.

209.  Defendants have no facially plausible interest in defending against separate, geographically dispersed claims and, in fact, that would be more burdensome to Defendants than defending against all potential claims in a single forum and proceeding. By proceeding as a class action, the claims at issue can be managed efficiently through economies of scale.

210.  Additionally, the claims are manageable, each Subclass claim is governed by one state's law and those laws are consonant with one another. Defendants' misconduct impacts all Class Members, whose losses are capable of calculation on a class-wide or subclass-wide basis.

211.  Ultimately, the class action procedure is superior to other methods of adjudicating the Plaintiffs and Class Members' claims. This is precisely why class actions exist—class treatment facilitates the fair, uniform and efficient adjudication of claims, as it would here, and it promotes judicial economy while avoiding the undue financial, administrative and procedural burdens that necessarily would result from a multiplicity of individual actions.

## VI.    REALLEGATION AND INCORPORATION BY REFERENCE

212.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs and allegations of this Complaint, including the Introduction, all Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the Claims for Relief asserted on behalf of the Nationwide Class and the State Subclasses in Volume II of the Complaint.

*(the Complaint continues at Volume II concurrently filed herewith)*